UNITED STATES BREWERS
ASSOCIATION, INC., et al.,
Plaintiffs-Appellants,

v.

John F. HEALY, et al.,
Defendants-Appellees.

No. 994, Docket 82–7158.

United States Court of Appeals,
Second Circuit.

Argued May 19, 1982.

Decided Nov. 1, 1982.

William H. Allen, Washington, D.C. (H. Thomas Austern, Richard A. Friedman, Sarah E. Burns, Covington & Burling, Washington, D.C., Winthrop J. Allegaert, Thomas J. Sheridan, III, Richards, O'Neil & Allegaert, New York City, on brief), for plaintiffs-appellants U.S. Brewers Ass'n, et al.

William Hughes Mulligan, New York City (John D. Feerick, Jeffrey Glekel, Charles M. Yablon, Timothy G. Reynolds, Skadden, Arps, Slate, Meagher & Flom, New York City, Day, Berry & Howard,

Hartford, Conn., of counsel), for plaintiff-appellant Anheuser-Busch, Inc.

John R. Lacey, Asst. Atty. Gen., Hartford, Conn., Richard M. Sheridan, Asst. Atty. Gen., Newington, Conn. (Carl R. Ajello, Atty. Gen. of the State of Conn., Robert M. Langer, Asst. Atty. Gen., Hartford, Conn., Robert F. Vacchelli, Asst. Atty. Gen., Newington, Conn.), for defendants-appellees John F. Healy, et al.

Before TIMBERS, VAN GRAAFEILAND, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiffs United States Brewers Association, a non-profit corporation representing brewers and importers of beer, and individual companies that are brewers or importers of beer, appeal from a final judgment of the United States District Court for the District of Connecticut, M. Joseph Blumenfeld, *Judge,* dismissing their complaint against defendants John F. Healy, *et al.,* officials of the Connecticut Liquor Control Department, seeking declaratory and injunctive relief to prohibit the enforcement of §§ 30–63a(b), 30–63b(b), and 30–63c(b) (the "beer price affirmation" provisions or "Connecticut statute") of the Connecticut Liquor Control Act, Conn.Gen.Stat.Ann. §§ 30–1 to 30–113 (West 1975 & Supp. 1982). Plaintiffs contended principally that the beer price affirmation provisions violate the Supremacy Clause of the Constitution, art. VI, cl. 2, by requiring them to violate § 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and place an impermissible burden on interstate commerce in violation of the Commerce Clause of the Constitution, art. I,

§ 8, cl. 3. In an opinion reported at 532 F.Supp. 1312 (1982), the district court granted summary judgment in favor of defendants. Since we conclude that the Connecticut statute places an unconstitutional burden on interstate commerce, we reverse.

## I. FACTS

The Connecticut Liquor Control Act is a comprehensive statute regulating the sale and distribution of liquor in Connecticut. Historically the retail price of beer has been generally higher in Connecticut than in its neighboring states, *i.e.,* Massachusetts, New York, and Rhode Island. As a consequence Connecticut residents have crossed state borders in significant numbers to purchase beer in other states at lower retail prices. In 1981, the Connecticut legislature amended the Liquor Control Act, effective January 1, 1982, by enacting the beer price affirmation provisions challenged here. The district court found it undisputed that the purpose of these provisions was to lower the retail price of beer in Connecticut, thereby increasing the purchase of beer by Connecticut residents within the state and generating increased tax revenues for the state. 532 F.Supp. at 1316–17.

Several provisions were adopted to achieve these goals. Conn.Gen.Stat. § 30–63(c) provides, as it did before the 1981 amendments, that each manufacturer or importer of beer (collectively "brewers")[1] must file a schedule stating the per-unit[2] price that it will charge Connecticut wholesalers for its products in the following month.[3] These "posted prices" must be

1. The statute, *see* notes 3, 5, 6, and 7 *infra,* refers to "manufacturers" and "out-of-state shipper" permittees. There are no breweries in Connecticut, and the beer price affirmation provisions hence impose requirements only on out-of-state companies.

2. Prices are to be posted per bottle, per can, and per case for every size container. We use the term "per unit" to encompass all of these.

3. Section 30–63(c) (West Supp.1982) provides, in pertinent part, as follows:

Each manufacturer, wholesaler and out-of-state shipper permittee shall post with the

department the bottle, can and case price of any brand of goods offered for sale in Connecticut, which price when so posted shall be the controlling price for such manufacturer, wholesaler or out-of-state permittee for the month following such posting.... A manufacturer or wholesaler may amend his posted price for any month to meet a lower price posted by another manufacturer or wholesaler with respect to alcoholic liquor bearing the same brand or trade name and of like age, vintage, quality and unit container size; provided that any such amended price posting shall be filed before three o'clock P.M. of the fourth business day after the last day for

filed on the thirteenth day of the prior month, Conn. Dep't of Liquor Regs. § 30–6–B4; and § 30–63(c) as amended in 1981 provides that the posted prices may not be changed, except that within the four-day period following the posting deadline a manufacturer or wholesaler may lower its posted price to meet, but not to beat, the lower posted price of another manufacturer or wholesaler with respect to a beer of like grade and quality. A brewer is not permitted to deviate from its posted prices in selling to Connecticut wholesalers during the one-month period to which the posting applies. *Id.*

Conn.Gen.Stat. § 30–63b(b) was added to require that when the brewer posts its prices pursuant to § 30–63(c), it must also file a sworn affirmation that its posted per-unit prices will be no higher than its

> posting prices; and provided further such amended posting shall not set forth prices lower than those being met.

> The portion of the section preceding the ellipsis was part of the Liquor Control Act prior to the 1981 amendments; the portion following the ellipsis was added in 1981.

4. The statute, *see, e.g.,* note 5 *infra,* refers to shipment, transport, delivery, sale, etc. For convenience we use the term "sale" to encompass all of these.

5. Section 30–63b(b) (West Supp.1982) provides as follows:

> At the time of posting of the bottle, can and case price required by section 30–63, every holder of a manufacturer or out-of-state shipper's permit, or the authorized representative of a manufacturer, shall file with the department of liquor control a written affirmation under oath by the manufacturer or out-of-state shipper of each brand of beer posted certifying that the bottle, can or case price to the wholesaler permittees during the period of the posting will be no higher than the lowest price at which each such item of beer is or will be sold, offered for sale, shipped, transported or delivered by such manufacturer or out-of-state shipper to any wholesaler in any state bordering this state, at any time during the calendar month covered by such posting.

6. Section 30–63a(b) (West Supp.1982) provides as follows:

> No holder of any manufacturer or out-of-state shipper's permit shall ship, transport or deliver within this state, or sell or offer for sale to a wholesaler permittee any brand of beer as defined in section 30–1, at a bottle, can or case price higher than the lowest price

prices for the corresponding units sold[4] in any state bordering Connecticut during the month covered by the posting.[5] In the same vein, § 30–63a(b) was added to prohibit a brewer from selling beer to a Connecticut wholesaler at a unit price higher than the lowest price charged for that unit by the brewer in any state bordering Connecticut.[6]

Finally, new § 30–63c(b) provides that a brewer's "lowest" price to a wholesaler in a neighboring state is to be determined by taking into account adjustments for rebates, discounts, allowances, and other inducements of any kind offered to the out-of-state wholesaler; and it requires each brewer to offer to Connecticut wholesalers all of the same sizes of its brand that are offered in the bordering states.[7] For a

> at which such item is then being sold or offered for sale or shipped, transported or delivered by such manufacturer or out-of-state shipper to any wholesaler in any state bordering this state.

7. Section 30–63c(b) (West Supp.1982) provides as follows:

> In determining the lowest price for which any item of beer is or was sold, offered for sale, shipped, transported or delivered during such posted period by any manufacturer or out-of-state shipper to a wholesaler in any state bordering this state, appropriate reductions will be made for all discounts, rebates, free goods, allowances and other inducements of any kind whatsoever, including depletion and floor-stock allowances, offered or given to any such wholesaler; provided that differentials in price which make only due allowance for differences in state taxes and fees and for the actual cost of delivery are permissible. As used in this section, the term "state taxes and fees" shall mean the excise taxes imposed or the fees required by any state or the District of Columbia upon or based upon a gallon or liter of such alcohol and spirits or each barrel, or fractional unit thereof, of beer and the term "gallon" shall mean one hundred twenty-eight fluid ounces and the term "liter" shall mean one thousand milliliters and the term "barrel" means not less than twenty-eight nor more than thirty-one gallons. A manufacturer or out-of-state shipper of beer shall offer to Connecticut wholesalers all of the sizes, approved by the department of liquor control, of his brand which he offers to any wholesaler in any state bordering this state.

violation of these provisions a brewer may have its permit to do business in Connecticut revoked or suspended, Conn.Gen.Stat. Ann. § 30–57 (West Supp.1982), or may be fined $1000 and/or imprisoned for up to one year, Conn.Gen.Stat.Ann. § 30–113 (West Supp.1982).

Plaintiffs commenced the present action seeking declaratory and injunctive relief prohibiting the enforcement against them of the beer price affirmation provisions, contending that the Connecticut statute is unconstitutional in two principal respects.[8] First, plaintiffs argued that the beer price affirmation provisions require industry-wide conduct tantamount to the fixing of minimum prices, which would violate § 1 of the Sherman Act, 15 U.S.C. § 1, if undertaken voluntarily by private parties. They contended that the Connecticut provisions are thus preempted by the Sherman Act, and that the enforcement of the state provisions would violate the Supremacy Clause of the Constitution. Second, plaintiffs contended that the Connecticut statute is protectionist legislation that impermissibly burdens interstate commerce and discriminates against out-of-state businesses in violation of the Commerce Clause. Defendants, on the other hand, contended that the Twenty-first Amendment to the Constitution gives the state carte blanche to regulate the prices at which plaintiffs may sell beer in Connecticut and that, accordingly, plaintiffs' claims must fail. Both sides moved for summary judgment.

The district court granted defendants' motion and dismissed the complaint. The court held that the beer price affirmation statute does not violate the Supremacy Clause because it does not require brewers to enter into a contract, combination, or conspiracy in violation of the Sherman Act. 532 F.Supp. at 1328–30. The court rejected plaintiffs' Commerce Clause claims on the grounds that the legislation is not impermissibly protectionist or discriminatory in intent because it attempts only to equalize, not to favor, the competitive position of Connecticut dealers, id. at 1323; that the statute has no discriminatory effect because out-of-state wholesalers have "no right, constitutional or otherwise, to receive lower prices from the brewers," id. at 1324; and, relying on Joseph E. Seagram & Sons v. Hostetter, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966), that the statute does not place an undue burden on commerce, 532 F.Supp. at 1324–27.

On appeal, plaintiffs pursue their Supremacy Clause and Commerce Clause claims.[9] For the reasons below, we conclude that the Connecticut statute is permitted by neither the Commerce Clause nor the Twenty-first Amendment, and we reverse the judgment on that ground without reaching plaintiffs' Supremacy Clause contentions.

## II. DISCUSSION

The Commerce Clause of the Constitution provides that "Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States ...." U.S.Const. art. I, § 8, cl. 3. This grant of authority to Congress has long been construed to place implicit limitations on actions affecting interstate commerce that may be taken by individual states. See, e.g., Cooley v. Board of Wardens, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851); The Passenger Cases, 48 U.S. (7 How.) 282, 12 L.Ed. 72 (1849). In general the Commerce Clause is viewed as intending to promote free trade among the states and to liberate the flow of articles in commerce from the provincialism evident in many local regulations. See, e.g., Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 522, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935).

---

**8.** The action was commenced prior to the effective date of the amendments and plaintiffs unsuccessfully sought a preliminary injunction against enforcement.

**9.** In the district court plaintiffs contended also that the Connecticut statute violated their rights to substantive due process and infringed on the powers of Massachusetts, New York, and Rhode Island under the Twenty-first Amendment to regulate the sale of beer within their respective borders. Plaintiffs do not pursue these arguments on appeal.

## A. General Commerce Clause Principles

With these goals in mind several general precepts regarding the Commerce Clause have been formulated. State regulation that is designed to confer economic benefits on the businesses and residents of the state, and to do so at the expense of businesses and residents of other states, is generally impermissible. *See, e.g., Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 350–53, 97 S.Ct. 2434, 2445–2446, 53 L.Ed.2d 383 (1977). Such discriminatory regulation constitutes "simple economic protectionism," which is "virtually *per se*" unconstitutional. *City of Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978) (state prohibition of use of local landfills for garbage of out-of-state origin violates Commerce Clause).

If, on the other hand, the state regulation does not seek to distinguish between articles of commerce on the basis of their domestic or out-of-state origins, and the effects on interstate commerce are only incidental, the regulation will be found to burden commerce impermissibly only if, on balance, the benefits sought by the regulating state outweigh the detriments to interstate commerce. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 36–37, 100 S.Ct. 2009, 2015–2016, 64 L.Ed.2d 702 (1980); *Hughes v. Oklahoma,* 441 U.S. 322, 331, 99 S.Ct. 1727, 1733, 60 L.Ed.2d 250 (1979). In *Pike v. Bruce Church,* the Supreme Court stated this principle as follows:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well

with a lesser impact on interstate activities.

397 U.S. at 142, 90 S.Ct. at 847 (citation omitted). Where the local interest involved could plainly have been promoted with a lesser impact on interstate activities, the state regulation has been held to violate the Commerce Clause. *E.g., Great Atlantic & Pacific Tea Co. v. Cottrell,* 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976) (where local inspections could serve purpose of ensuring that local health standards were met, statute permitting sale of out-of-state milk in Mississippi only if the state of origin allowed sale therein of Mississippi milk on a reciprocal basis impermissibly burdened commerce).

If the purpose or effect of a state's law is to regulate conduct occurring wholly outside the state, the burden on commerce is generally held impermissible, and the fact that the law may not have been intended as protectionist or discriminatory will not save it. In *Shafer v. Farmers Grain Co.,* 268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925), the Court stated that "a state statute which by its necessary operation directly interferes with or burdens such commerce is a prohibited regulation and invalid, regardless of the purpose with which it was enacted." Thus, it has been held repeatedly that where the practical effect of a state's legislation is to control conduct in *other* states, the regulation violates the Commerce Clause. *E.g., New York, Lake Erie & Western Railroad v. Pennsylvania,* 153 U.S. 628, 646, 14 S.Ct. 952, 958, 38 L.Ed. 846 (1894) (state may not constitutionally regulate payments made by railroad in another state); *Shafer v. Farmers Grain Co., supra,* 268 U.S. at 201, 45 S.Ct. at 486 (regulation of in-state purchases with a view to preventing "unreasonable margins of profit" on out-of-state resales violates Commerce Clause); *Fidelity & Deposit Co. v. Tafoya,* 270 U.S. 426, 435, 46 S.Ct. 331, 332, 70 L.Ed. 664 (1926) (state may not prevent corporation from employing and paying out-of-state agents needed for its in-state business); *Baldwin v. G.A.F. Seelig, Inc., supra,* 294 U.S. at 524, 528, 55 S.Ct. at 500, 502 (interstate commerce unduly burdened by

state law forbidding in-state resale of milk purchased from out-of-state farmers at prices below the minimum prices required to be paid to in-state farmers); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 775, 65 S.Ct. 1515, 1523, 89 L.Ed. 1915 (1945) (state may not regulate length of trains within its territory where "practical effect . . . is to control train operations beyond [its] boundaries . . . because of the necessity of breaking up and reassembling long trains at the nearest terminal points before entering and after leaving the regulating state"); *see also Edgar v. Mite Corp.,* —— U.S. ——, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982) (opinion of White, J.) ("Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the state's borders, whether or not the commerce has effects within the state").

In *Edgar v. Mite Corp.,* the Supreme Court dealt with an Illinois statute that regulated tender offers for corporations at least 10% of whose securities subject to the offer were owned by shareholders located in Illinois. The Court observed that the statute would interfere with the rights of non-Illinois shareholders to sell their shares to a non-Illinois buyer in a transaction outside of Illinois, and concluded that even applying the balancing test set forth in *Pike v. Bruce Church, Inc., supra,* the extraterritorial effect of the statute far outweighed its in-state benefits:

> The most obvious burden the Illinois Act imposes on interstate commerce arises from the statute's previously-described nationwide reach which purports to give Illinois the power to determine whether a tender offer may proceed anywhere.
>
> . . . .
>
> While protecting local investors is plainly a legitimate state objective, the

state has no legitimate interest in protecting non-resident shareholders. Insofar as the Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law. *Id.* at 2641–42.[10]

B. *Principles Governing Commerce in Alcoholic Beverages*

 To an extent, the limitations placed by the Commerce Clause upon the powers of individual states to regulate commerce have been altered with respect to alcoholic beverages by the Twenty-first Amendment to the Constitution. Section 2 of that Amendment provides as follows:

> The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

The Twenty-first Amendment thus gives the states broad power to ban, restrict, or otherwise regulate importation and in-state traffic in alcoholic beverages, and thereby eliminates some of the otherwise applicable Commerce Clause constraints. *See Joseph E. Seagram & Sons v. Hostetter, supra,* 384 U.S. at 42, 86 S.Ct. at 1259. For example, a state may prohibit entirely the sale of intoxicating liquors within its borders, *see State Board of Equalization v. Young's Market Co.,* 299 U.S. 59, 62–63, 57 S.Ct. 77, 78–79, 81 L.Ed. 38 (1936), although under traditional Commerce Clause limitations it could not ban the sale of other products, *see, e.g., Baldwin v. G.A.F. Seelig, Inc., supra,* 294 U.S. at 521, 55 S.Ct. at 499 (wholesome milk); *Railroad Co. v. Husen,* 95 U.S. 465, 24 L.Ed. 556 (1877) (healthy cattle). Or a state may prohibit local dealers from selling beer manufactured in another state on the ground that the latter state discriminates against beer manufac-

10. *See also id.* at 2641 (opinion of White, J.):
The limits on a state's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, "any attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power."

*Shaffer v. Heitner,* 433 U.S. 186, 197, 97 S.Ct. 2569, 2576, 53 L.Ed.2d 683 (1977).
Because the Illinois Act purports to regulate directly and to interdict interstate commerce, including commerce wholly outside the state, it must be held invalid as were the laws at issue in *Shaffer* and [*Southern Pacific Co. v. Arizona, supra* ].

tured in the first state, *see Indianapolis Brewing Co. v. Liquor Control Commission,* 305 U.S. 391, 59 S.Ct. 254, 83 L.Ed. 243 (1939), although it would not be free to impose the same type of restrictions with respect to milk, *see Great Atlantic & Pacific Tea Co. v. Cottrell, supra;* nor could it constitutionally prohibit the exportation of local ground water to another state on the basis that the latter state would forbid exportation of its water to the first state, *see Sporhase v. Nebraska,* —— U.S. ——, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982).

■ Notwithstanding the greater scope permitted to the states for regulation of traffic in intoxicating beverages, nothing in the Twenty-first Amendment suggests that a state may regulate the sale of liquor outside of its own territory. The Amendment itself speaks only of the "transportation or importation *into* any State ... for delivery or use *therein.*" (Emphasis added.) Nor do the cases interpreting the Amendment indicate that the Amendment, any more than the Commerce Clause, allows a state to regulate liquor traffic outside its territory. Thus, the Supreme Court has noted that "the second section of the Twenty-first Amendment has not operated totally to repeal the Commerce Clause in the area of the regulation of traffic in liquor," *Joseph E. Seagram & Sons v. Hostetter, supra,* 384 U.S. at 42, 86 S.Ct. at 1259, and has indicated that the traditional Commerce Clause strictures are inapplicable only

" 'when [the state] restricts the importation of intoxicants destined for use, distribution, or consumption *within its borders,* '" *id.* (emphasis added) (quoting *Hostetter v. Idlewild Bon Voyage Liquor Corp.,* 377 U.S. 324, 330, 84 S.Ct. 1293, 1296, 12 L.Ed.2d 350 (1964)). Accordingly, the Court has held it impermissible for a state to prevent shipment into and through its territory of liquor destined for distribution and consumption in a national park, an area not within the state's governance, *Collins v. Yosemite Park & Curry Co.,* 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502 (1938), or of liquor destined for ultimate delivery and use in a foreign country, *Hostetter v. Idlewild Bon Voyage Liquor Corp., supra.* We are aware of no authority to the effect that the Twenty-first Amendment modifies the traditional Commerce Clause principles that bar a state from regulating the transport, sale, or use of products outside of its own territory.

## C. *Applicability of Commerce Clause and Twenty-first Amendment Principles to Connecticut's Beer Price Affirmation Provisions*

■ Plaintiffs have launched an all-out attack on the Connecticut beer price affirmation provisions under the Commerce Clause, contending, *inter alia,* that the statute was enacted with a discriminatory purpose,[11] that it will have a discriminatory effect,[12] that it burdens interstate com-

---

11. Plaintiffs argue that the purpose of the statute was to protect local wholesalers and retailers from competition with out-of-state wholesalers and retailers. (*See* Anheuser-Busch brief on appeal at 8.) The district court found this contention unsupported by the record. 532 F.Supp. at 1318 n.16, 1323.

12. The district court rejected the contention that the legislation had a discriminatory effect, stating as follows:

Plaintiffs argue that regardless of its purpose the statute has a discriminatory *effect* on out-of-state *wholesalers* and *retailers.* It is significant that the brewers here are attempting to invalidate the statute not because of its direct effects on them, but because of its indirect effects on third parties. They do not argue that the statute discriminates against out-of-state brewers or importers for the simple reason that there are no

Connecticut brewers or importers. *See Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 125, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978).

The brewers assert that the statute discriminates against out-of-state wholesalers and retailers. It is difficult, however, to conceive of the nature of the alleged discrimination. The statute does not affect any business out-of-state wholesalers or retailers conduct *in* Connecticut, since they are not permitted by law to sell beer within the state. Nor does the statute affect any rights to which out-of-state wholesalers or retailers are entitled. The brewers' argument, based on *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 351–52, 97 S.Ct. 2434, 2445–2446, 53 L.Ed.2d 383 (1977), that the statute strips out-of-state retailers of a competitive advantage—lower prices—misses the point. Out-of-state wholesalers and

merce by restricting the movement of consumers across state lines,[13] and that the law is ill-suited to achieve Connecticut's goals.[14] We need reach none of these contentions, however, in order to find the beer price affirmation provisions on their face an impermissible burden on commerce, for it is evident that the Connecticut statute seeks to regulate prices not just in Connecticut but in its surrounding states as well.

Section 30–63(c), which requires the posting of prices to be charged to Connecticut wholesalers for the coming month, is not itself in issue, for, standing alone, it has no extraterritorial effect. But the extraterritorial thrust of the main beer price affirmation provisions, §§ 30–63a(b) and 30–63b(b), see notes 6 and 5 supra, is plain, for those sections prevent a brewer from selling below the Connecticut wholesaler price to any wholesaler in any neighboring state. In other words, these sections tell a brewer that for any given month when it sells beer to a wholesaler in Massachusetts, New York, or Rhode Island, it may not do so at a price lower than that it has previously announced it will charge to Connecticut wholesalers. As the district court succinctly described it,

> [b]ecause it is geared to the future, the Connecticut statute effectively sets minimum prices for the four-state area once the price is posted in Connecticut on the thirteenth of the month.

532 F.Supp. at 1329.[15]

Thus, the obvious effect of the Connecticut statute is to control the minimum price that may be charged by a non-Connecticut brewer to a non-Connecticut wholesaler in a sale outside of Connecticut. Nothing in the Twenty-first Amendment permits Connecticut to set the minimum prices for the sale of beer in any other state, and well-established Commerce Clause principles prohibit the state from controlling the prices set for sales occurring wholly outside its territory.

Defendants' reliance on *Joseph E. Seagram & Sons v. Hostetter, supra,* as sanctioning Connecticut's beer price affirmation provisions, is misplaced. In *Seagram,* the Court considered a New York law that re-

---

retailers are not entitled to receive prices lower than those charged to their Connecticut counterparts. The out-of-state wholesalers and retailers have not, and could not complain that the statute takes from them the advantage of lower prices, when they have no right to those prices in the first place. If Connecticut may constitutionally regulate the prices brewers charge to their wholesalers, then it would seem to follow that the brewers may not complain about the incidental effects. on their out-of-state customers when those effects do not implicate constitutional rights. Since it is clear that out-of-state wholesalers and retailers have no right, constitutional or otherwise, to receive lower beer prices from the brewers, there is nothing about which the brewers may complain. I therefore hold that the beer price affirmation statute does not discriminate against out-of-state businesses and does not, in this respect, contravene the Commerce Clause.

532 F.Supp. at 1324 (footnote omitted; emphasis in original).

**13.** The district court rejected this argument on the ground, among others, that

[t]he statute may reduce the incentives for Connecticut consumers to drive out of state for purchases of beer, but it does not involuntarily restrict their movements. That consumers may, of their own free will, decide

not to drive to bordering states to purchase beer can hardly be characterized as a burden on interstate commerce.

532 F.Supp. at 1328.

**14.** Plaintiffs argue that the Connecticut statute is unlikely to have the desired effects of increasing tax revenues (United States Brewers Association reply brief on appeal at 5) and of reducing prices to consumers: "[n]othing in the new law or any other Connecticut law is designed to ensure that, if prices to Connecticut wholesalers are reduced as a result of beer price affirmation (by no means a certainty), the reduction will be passed along to retailers and ultimately to Connecticut consumers." (United States Brewers Association brief on appeal at 45.) The district court found it unnecessary to reach these issues because it found the law did not burden commerce. 532 F.2d at 1327 n.52. In any event we consider that these issues, like several others raised by plaintiffs, do not appear to be particularly appropriate for resolution in plaintiff's favor by summary judgment.

**15.** The district court discussed this extraterritorial thrust of the Connecticut statute only in its analysis of plaintiffs' Supremacy Clause claims and does not appear to have focused on this aspect of the law in analyzing the effect on commerce.

quired liquor manufacturers to post monthly price schedules for sales of liquor in New York, with "an affirmation that 'the bottle and case price of liquor ... is no higher than the lowest price' at which sales were made anywhere in the United States during the *preceding* month." 384 U.S. at 39–40, 86 S.Ct. at 1257–1258 (emphasis added). The New York statute differed significantly from the Connecticut statute, because, unlike Connecticut's beer price affirmation provisions which control brewers' future conduct in the states surrounding Connecticut, the New York law in *Seagram* merely required that New York prices reflect what had been charged elsewhere in the past. Thus, the New York law, although it affected the prices that manufacturers would choose to set in other states, did not limit the freedom of a manufacturer at any given time to raise or lower prices in any other state.

In ruling that the New York statute in *Seagram* did not violate the Commerce Clause, the Court stated as follows:

> We need not now decide whether the mode of liquor regulation chosen by a State in such circumstances could ever constitute so grave an interference with a company's operations elsewhere as to make the regulation invalid under the Commerce Clause. *See Baldwin v. G.A.F. Seelig,* 294 U.S. 511 [55 S.Ct. 497, 79 L.Ed. 1032]. No such situation is presented in this case. The mere fact that § 9 is geared to appellants' pricing policies in other States is not sufficient to invalidate the statute. As part of its regulatory scheme for the sale of liquor, New York may constitutionally insist that liquor prices to domestic wholesalers and retailers be as low as prices offered elsewhere in the country.

*Id.* at 42–43, 86 S.Ct. at 1259–1260 (footnote omitted). The Court had taken care to note that this New York law, unlike that invalidated in *Hostetter v. Idlewild Bon Voyage Liquor Corp., supra,* concerned liquor destined for use or distribution only "in the State of New York." *Id.* at 42, 86 S.Ct. at 1259.

We thus find in *Seagram* no indication that a state is permitted to control the prices at which liquor may be sold in other states, and we believe the *Seagram* Court's recognition that the New York statute regulated prices only within New York is highlighted by the Court's repeated references to *Baldwin v. G.A.F. Seelig, Inc.* The *Seagram* Court first cited *Seelig* in stating that there was no need in *Seagram* to decide whether the mode of liquor regulation within a state could "constitute so grave an interference with a company's operations elsewhere as to make the regulation invalid under the Commerce Clause." 384 U.S. at 42–43, 86 S.Ct. at 1259, 1260. In *Seelig,* the Court had held unconstitutional a New York statute that forbade the sale of Vermont-produced milk in New York unless the price paid to Vermont farmers was as high as the minimum price New York law required to be paid to New York farmers. Analysis in *Seelig* had commenced with the recognition that "New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there." 294 U.S. at 521, 55 S.Ct. at 499. The *Seagram* Court's second citation to *Seelig* followed its observation that " '[t]he mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids.' " *Id.* at 43, 86 S.Ct. at 1260 (quoting *Osborn v. Ozlin,* 310 U.S. 53, 62, 60 S.Ct. 758, 761, 84 L.Ed. 1074 (1940)). The Court then cited *Seelig* and other cases, presumably to indicate what actions may be "within that domain which the Constitution forbids," and the page of the *Seelig* opinion to which the *Seagram* Court referred contains the statement that "[i]t is a very different thing to establish a ... scale of prices for use in other states ...." 294 U.S. at 528, 55 S.Ct. at 502.

Given the latitude allowed a state under the Twenty-first Amendment to regulate the sale of liquor within its own borders, the holding in *Seagram* might well validate beer price regulation less intrusive than the present Connecticut statute, such as a requirement simply that a brewer set its Con-

necticut prices at the lowest levels it chooses to set in the surrounding states, *see* 384 U.S. at 43–45, 86 S.Ct. at 1260–1261, leaving those out-of-state prices unregulated by Connecticut. But nothing in *Seagram* purports to rule that a state may achieve its goal of price-parity by the far more drastic, and clearly excessive, method of controlling the minimum prices at which liquor may be sold outside of its own territory. We conclude that "[i]nsofar as the [Connecticut] statute burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law." *Edgar v. Mite Corp., supra.*

## CONCLUSION

The judgment is reversed and the case is remanded to the district court for entry of judgment, in accordance with this opinion, in favor of plaintiffs.