Ignatius **WALLACE** and Rochelle Vana, Plaintiffs,

v.

**TOWN OF PALM BEACH, a Florida Municipal Corporation; Joseph Terlizzese, Chief of Police for Town of Palm Beach, Florida; Charles Warwick, Robert Grace and Paul Ilyinsky, in their capacities as present or former members of the Town Council of the Town of Palm Beach, Florida; Defendants.**

No. 83–8268–CIV.

United States District Court,
S.D. Florida,
Fort Lauderdale Division.

Dec. 16, 1985.

---

James K. Green, Green, Eisenberg & Cohen, West Palm Beach, Fla., David Lipman, Miami, Fla., for plaintiffs.

Maureen A. Hackett, John Randolph, Johnston, Sasser, Randolph & Weaver, West Palm Beach, Fla., for defendants.

### ORDER

ROETTGER, District Judge.

### INTRODUCTION

Plaintiffs' suit attacks as unconstitutional a Palm Beach ordinance, which requires an identification card to be issued to certain groups of employees, viz, domestic servants, taxi drivers, retail clerks, hotel, restaurant, and bar employees, etc.

### STATEMENT OF THE CASE

Plaintiffs, IGNATIUS WALLACE ("Wallace") and ROCHELLE VANA ("Vana"), brought an action in this Court under 42 U.S.C. § 1983 to declare invalid and enjoin enforcement of Article V, Sections 17–92 and 17–94, Town of Palm Beach Code,[1] a registration ordinance enacted by Defendant, TOWN OF PALM BEACH ("Palm Beach"). In addition, Plaintiffs seek damages, attorneys fees and costs. Plaintiffs urge that the ordinance impermissibly infringes on rights secured to them under the United States Constitution: 1) the commerce clause (Article 1, § 8), 2) the equal protection clause of the Fourteenth Amendment, 3) the Fourth Amendment guarantee against unreasonable search and seizure, 4) the right of privacy, 5) the right to travel, and 6) the privileges and immunities of United States citizenship.

Plaintiff, IGNATIUS WALLACE, is an adult black male citizen of the United States and a resident of West Palm Beach, Florida.[2] Plaintiff, ROCHELLE VANA, is an adult white female citizen of the United States and a resident of West Palm Beach, Florida.

Defendant, TOWN OF PALM BEACH, is a Florida municipal corporation located within the Southern District of Florida. Defendant, JOSEPH TERLIZZESE ("Terlizzese"), is Chief of Police of the Town of Palm Beach. Defendants, CHARLES WARWICK ("Warwick"), ROBERT GRACE ("Grace") and PAUL ILYINSKY ("Ilyinsky"), were members of the Town Council when this action was filed, but were dismissed by Plaintiffs.

---

1. Article V, Sections 17–92 and 17–94, Town of Palm Beach Code, is appended hereto as Appendix A.

2. Wallace testified he is a permanent resident of West Palm Beach, although he was residing in Atlanta, Georgia for the six months prior to trial.

At all material times, and in all their actions involved in this case, Defendants were acting under color of law and under color of their authority as public officials and public employees.

## FINDINGS OF FACT

1. On February 25, 1983, Wallace applied for employment with the Breakers, a hotel located in the Town of Palm Beach. On March 2, 1983, Wallace was offered a job delivering ice at the minimum wage and advised that he was required to register with the Chief of Police.

2. Wallace went to register with the Chief of Police but was "anguished" about the fingerprint and photograph requirements and objected to the information regarding race on the identification card. Wallace was previously fingerprinted in the armed services, for purposes of employment with the Palm Beach School Board, and on a misdemeanor charge. Wallace claimed he did not have the $4.00 fee for the identification card so he refused to register and subsequently declined the employment.

3. Wallace next found part-time employment two (2) months later, but he did not secure full-time employment until six (6) months prior to trial. He now works as a television technician for a video supply company in Atlanta and earns more than the minimum wage. Wallace asserts he still desires employment in Palm Beach. The Court concluded at trial that Wallace's testimony almost totally lacked credibility, except for some personal data.

4. Vana and her husband moved from Indiana to West Palm Beach to seek employment in Palm Beach, as well as for other personal reasons.[3] On the day after she arrived in Florida, Vana was hired as a waitress by the Sailfish Club of Florida, Inc. in Palm Beach at an annual salary of $12,000.00 to $14,000.00. After working at the Club for six (6) months, Vana first learned of the registration requirement when her husband was advised by his Palm Beach employer to comply with the ordinance. The Sailfish Club constitutes a "place handling liquor, beer or wine" within the meaning of Section 17–92, Town of Palm Beach Code.

5. On April 18, 1983, Vana and her husband went to register with the Chief of Police. Vana filled out the registration form but became so upset she began to cry and refused to be fingerprinted or sign the form, exclaiming, "This is America, not Russia!"[4] Vana explained her acute reaction to the fingerprint procedure as a result of her husband's experience in Czechoslovakia; however, her husband made no objection and completed the registration procedure. Despite her stated revulsion to the fingerprint requirement, Vana willingly had submitted to being fingerprinted previously for purposes of employment both as a probation and parole officer and with the School Board. Vana testified that she did not object so much to the information requested but as to *who* had it (the police) and *where* she had to go to provide the information (the police station).

6. Testifying she feared arrest for not registering, Vana quit her job at the Sailfish Club on May 8, 1983, after securing employment as a waitress at Burdines in West Palm Beach. Vana told the Sailfish Club she left because the hours were better at Burdines. Vana is now employed full-time as a high school teacher and part-time as a waitress in Burdines earning more money than she made at the Sailfish Club. Vana asserts she still desires employment in a Palm Beach restaurant. The court found serious credibility contradictions in her testimony, as set forth in Findings 5 and 6.

7. Palm Beach is unique in its extremely high concentration of wealth and afflu-

3. Vana's stepson lives in this area.

4. Vana testified that the registration reminded her of the booking process, although there was no testimony she had ever been arrested and booked.

ence, not only among its homes,[5] but also in its businesses. This international resort area experiences a predictable population variation from 10,000 in the summer to 44,000 in the winter. Seasonal residents often travel with their domestic servants from out-of-state to winter in Palm Beach. A drive along the ocean, window-shopping on Worth Avenue, or a stroll through the lobby of the Breakers Hotel attests to wealth that is probably higher per capita than anywhere else in this country.[6] Palm Beach is also unique in the many dignitaries who visit and reside in the town.[7] The Breakers Hotel, world-renowned, as well as one of the nation's few five-star hotels, typically accommodates 900 to 950 guests in its 570 rooms, and serves as the site of major charity balls which attract affluent attendees. (The court can't help but notice that the one charity ball in America attended by the Prince of Wales and Princess Diana was held at the Breakers despite its not being the tourist "season".) The hotel is the largest employer in the town, operating with a base management staff of 800 to 850 and a total staff of as many as 1,200 employees. The Breakers has an agreement with Dartmouth College, which sends 25 to thirty (30) students every winter to work during the season.

8. Chief Terlizzese maintains that Palm Beach has a low crime rate by design, not by accident, and he credits that to the large police department, a Crime Watch program, the registration ordinance, the great number of security guards and security systems, and the community support of the police department. There are 102 employees in the local police department. Palm Beach's neighborhood Crime Watch program, the first in Palm Beach County, boasts the highest number of citizen participants in the county with 800 to 900 calls per year.

9. The Breakers Hotel employs 28 full-time employees on its own hotel security force and follows other security measures and careful employment practices, including maintaining guest safes in each room, checking references of applicants for employment, and issuing a picture identification card to employees in addition to the identification card issued by the Town. The Breakers advances the $4.00 town registration fee to employees if they lack those funds.

10. The major crime in Palm Beach is burglary and theft of property, which results in the loss of $2,500,000.00 to $5,000,000.00 per year.[8] The employee is a prime suspect in many theft cases, especially where there is no forced entry. Because the FBI provides the services of their fingerprint department to assist local law enforcement agencies only in solving major crimes, the Palm Beach Police Department is on its own in solving local burglaries and thefts.

11. In an attempt to reduce its crime rate and pursuant to authority granted by the state enabling act, Fla.Stat. § 166.021, Municipal Home Rule Powers Act, Palm Beach in 1958 enacted Article V, Sections 17–92 and 17–94 of the Town of Palm Beach Code. The ordinance superseded a

5. One of the mansions alone has art objects valued at about $50,000,000 and some mansions hire as many as 17 people in and around the grounds.

6. Testimony of Chief Terlizzese. Dr. Joseph Sheley, a criminologist qualified as an expert in *Service Machine*, testified that none of the representative communities he researched have a similar ordinance, including, Aspen, Colorado; Bar Harbor, Maine; Carmel, California; and Hilton Head, South Carolina. However, 17 of the 27 municipalities in Dade County, including Miami Beach, have similar ordinances, per Miami Herald review of presently pending State Legislative action.

7. The collection of pictures in the lobby of the Breakers Hotel shows the guests who frequent the town and attend the charity balls and parties in the course of a season include presidents, vice-presidents, cabinet members, senators, royalty, ambassadors, heads of industry and entertainment figures.

8. Plaintiff's expert did not comment on the dollar figure but testified that the crime rate is not extraordinary and in no sense is it high as compared with national figures.

similar one enacted in 1939. In accordance with § 17–92, it is the official policy and custom of the Town to require certain employees to register with the Chief of Police, be fingerprinted and photographed. Section 17–94 provides for the issuance of identification cards to the registrants and requires that the identification card be carried on the person at all times as evidence of registration and produced on reasonable notice.

12. To comply with the registration requirement of § 17–92, the applicant must complete a form with the following information: name, employer, occupation, date of birth, height, weight, social security number, local address, race, sex, hair, eyes, place of birth, next of kin, date issued, signature.[9] The identification card expires two (2) years from the date it is issued. A registration fee in the amount of $4.00 is required of all applicants.

13. The Palm Beach Police Department issues the identification card if the applicant meets the threshhold requirements: (1) falls within the type of occupation regulated under § 17–92, (2) produces evidence of employment,[10] and (3) following a computer check on fingerprints, the police department determines there are no current outstanding arrest warrants.[11]

14. The police department obtains other information about the past criminal records of applicants and will provide the information to other law enforcement agencies, but gives the employer only the assurance that there are no outstanding arrest warrants.

Any employer can send $15.00 to the Florida Department of Law Enforcement in Tallahassee to check the criminal background of an employee and receive a printed rap sheet of convictions. The Breakers both verifies its personnel records in this way, as well as utilizes—and supports—the Palm Beach i.d. procedure. However, where the police department can immediately obtain this information, as well as information on pending investigations which is unavailable to the employer, a private employer may wait six to eight weeks (or 15–60 days) which is simply too long because of the seasonal nature of the tourist industry.

15. The identification cards are issued at the rate of 300 per month in the summer and approximately 800 per month during the season. 10.9% of the identification cards are issued to residents of Palm Beach.[12]

16. An employee is notified of the registration requirement either by his employer[13] at the time of employment or by word of mouth. A police officer who becomes aware that an employee has not registered will warn him to do so before issuing a citation. Formerly, it was permissible for police officers to conduct random checks of identification cards, but that practice ceased in the 1960's and is no longer condoned. Chief Terlizzese admits that the ordinance is rarely enforced, and never enforced separate from other criminal activity or traffic violations.[14]

9. The identification card is appended as Appendix B.

10. The applicant is supposed to have evidence of employment from the employer, but, if he does not, the police department verifies the information with the employer.

11. Approximately 30 registrants per year have outstanding warrants, 80% of which are traffic or misdemeanor warrants.

12. Consequently, 89.1% of the identification cards are issued to non-residents of Palm Beach. The Court received imprecise testimony that there were "scores" of applicants from out-of-state. (This was the "gut" feeling of John Pauly, Jr., a part-time employee of Plaintiff's counsel

who reviewed 5,692 cards from February, 1983 through November, 1984). The evidence lacked trustworthiness.

13. Chief Terlizzese encourages employers to comply by talking to civic groups and through periodic news stories. Chief Terlizzese testified that the police department has cited employers on about four (4) occasions for not complying (with § 17–93 which is directed at employers).

14. The ordinance would be enforced in connection with a traffic or other arrest or if the employee was previously warned and failed to comply (Testimony of Chief Terlizzese).

## EXAMPLES OF BENEFITS OF IDENTIFICATION CARDS

17. One local department store had 7% inventory "shrinkage" in one year. The store manager requested assistance from the Palm Beach police, who urged compliance by the 32 employees with registration for the i.d. cards. One clerk was revealed as a heroin addict by the registration process and employment was terminated; two others suddenly moved elsewhere and the annual "shrinkage" dropped to 2%.

18. The fingerprints on the cards led to the solution of two rape-murders in West Palm Beach because only Palm Beach, through its i.d. card system, had prints of the murderers.

The defendant proffered that 30 or 40 large (for Palm Beach) employers had called to express support for the present ordinance.

## POLICE POWER

"In construing the validity of the ordinance in question, we must (1) assume that a valid ordinance was intended [and] (2) construe the ordinance to be legal, if possible to do so, and strive to so construe it as to give reasonable effect to its provisions." *City of Miami v. Kayfetz*, 92 So.2d 798, 801 (Fla.1957). Governments are given broad discretion in their internal affairs, "there being a peculiar propriety in permitting the inhabitants of a City through its proper officials to determine what rules are necessary for their own local government". *Id.* Therefore, in most instances, courts must refrain from interfering with the daily operation of a municipality to resolve conflicts which do not directly and sharply implicate constitutional values. See *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).

"Municipalities may enact laws in furtherance of the public health, safety and welfare, to the extent authorized by the states," and where a local government has the power to enact an ordinance, the legislative decision is presumptively constitutional. *Miami Herald Pub. Co. v. City of Hallandale*, 734 F.2d 666, 673 (11th Cir.

1984); *rev'd in part on other grounds*, 742 F.2d 590 (11th Cir.1984).

In considering whether or not the ordinance is reasonable, the test is not whether the decision of the Town Council appears wise or unwise, but whether it is rationally related to the public health, morals, safety or general welfare and promotes a legitimate municipal objective. *Kayfetz*, 92 So.2d at 801. Plaintiffs bear the burden to demonstrate that the challenged ordinance is so irrational that it serves no legitimate municipal interest.

The Town Council recognized that Palm Beach attracts a great many professional criminals and fraud artists who prey on the wealthy and that burglary and theft of property, the major crime in Palm Beach, accounts for the annual loss of between $2,500,000.00 and $5,000,000.00. However, the FBI is unavailable to assist the local police department in solving this type of property crime. Worse, fingerprint samples taken around the country are no longer submitted automatically to the FBI lab in Washington (apparently for peculiar reasons best known to the Congress). Consequently, fingerprints lifted at crime locations in Palm Beach or West Palm Beach or Fort Lauderdale may not be retrievable by law enforcement officers investigating a crime, even though the perpetrator's fingerprints have been taken at some point in time by another police department. Furthermore, the employee is a prime suspect in many theft cases.

■ The purpose of Palm Beach's registration ordinance was to assist in identifying and apprehending criminals. In addition, the Town posits that a fugitive will be deterred from moving into Palm Beach because of his reluctance to be fingerprinted. *See, Service Machine & Shipbuilding Corp. v. Edwards*, 466 F.Supp. 1200, 1205 (W.D.La.1979), *rev'd*, 617 F.2d 70 (5th Cir. 1980), *aff'd*, 449 U.S. 913, 101 S.Ct. 310, 66 L.Ed.2d 142 (1980). The Town's stated objectives are within the scope of authority delegated to the Town by the state and, therefore, the Town under its police power,

has the authority to enact reasonable regulations to control crime.

Plaintiffs have not met their burden to overcome the presumption that this ordinance is reasonable. This court holds that the Town Council's enactment of the ordinance was a reasonable exercise of its broad police powers in that the registration requirement bears a rational relationship to the Town's legitimate interest in controlling crime.

## COMMERCE CLAUSE

Plaintiffs attack the ordinance on the ground that it unduly restricts the free movement of labor in interstate commerce.

Article 1, Section 8 of the United States Constitution provides "The Congress shall have Power ... To regulate Commerce ... among the several States ..." U.S. Const. art. I, § 8, cl. 3.

*Edwards v. California*, 314 U.S. 160, 172–73, 62 S.Ct. 164, 166, 86 L.Ed. 119 (1941) established that the transportation of persons is "commerce" within the meaning of the Commerce Clause (high influx of migrants into California is commerce). *In accord, Service Machine & Shipbuilding Corp. v. Edwards*, 617 F.2d 70, 73 (5th Cir.1980), *aff'd*, 449 U.S. 913, 101 S.Ct. 310, 66 L.Ed.2d 142 (1980). "The movement of laborers across state or national boundaries constitutes commerce ..." *United States v. Hanigan*, 681 F.2d 1127, 1130 (9th Cir.1982), *reh'g and reh'g in banc denied* (1982), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1189, 75 L.Ed.2d 435 (1983) (movement of undocumented alien laborers across national boundary is commerce).

"The Commerce Clause has ... been interpreted ... not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). However, "not every exercise of state authority imposing some burden on the free flow of commerce is invalid ... Although the Commerce Clause acts as a limitation upon state power even without congressional im-

plementation.... 'in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it.'" *Southern Pacific Co. v. Arizona, ex rel. Sullivan*, 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945) quoted in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 350–51, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977). "Congress has not preempted state and local laws in the area of crime control. Thus, this court must examine the challenged ordinance to determine whether [it] ... run[s] afoul of the commerce clause ..." *Service Machine & Shipbuilding Corp.*, 617 F.2d at 73.

The appropriate standard for reviewing a local law affecting interstate commerce was stated in *Hughes*, 441 U.S. at 336, 99 S.Ct. at 1736, as follows:

Under the general rule we must inquire (1) whether the challenged statute regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce. The burden to show discrimination rests on the party challenging the validity of the statute ...

*See also, Service Machine & Shipbuilding Corp.*, 617 F.2d at 73.

When discrimination against commerce is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake.

*Hunt*, 432 U.S. at 353, 97 S.Ct. at 2446 in *Hughes*, 441 U.S. at 336, 99 S.Ct. at 1736.

The ordinance at issue is similar to a Louisiana workers registration ordinance

that was declared unconstitutional in *Service Machine & Shipbuilding Corp.*, 617 F.2d, as repugnant to the Commerce Clause. In *Service Machine*, St. Mary parish enacted an ordinance requiring workers who changed employment or who travelled into the parish seeking employment to register and obtain an identification card at a cost of $10.00. The district court upheld the ordinance. On appeal, the Fifth Circuit reversed, holding that even if the registration was applicable to all seeking employment, the registration system was unconstitutional because the local benefits of crime prevention were outweighed by the burden on interstate commerce in light of the availability of alternatives with a lesser impact on interstate activities. *Id.*

Under the first prong of *Hughes*, 441 U.S. at 336, 99 S.Ct. at 1736, the Court must determine whether the ordinance regulates evenhandedly, or discriminates against interstate commerce. "[T]he Supreme Court has found discrimination under laws that favor residents vis-a-vis non-residents, where there is no reason, apart from origin, to treat them differently." *Service Machine & Shipbuilding Corp.*, 617 F.2d at 74. In *Service Machine & Shipbuilding Corp.*, 617 F.2d at 74, the registration ordinance was found to discriminate in favor of local residents by requiring registration of non-residents seeking their first employment but not of residents applying for their first jobs.

Palm Beach's registration ordinance must be distinguished from the ordinance enacted by St. Mary parish in that the former requires registration of all those seeking employment in certain occupations in Palm Beach and applies to resident and non-resident alike. Testimony at trial concerning the 'incidental' effects on interstate commerce revealed the following: (1) Vana and her husband moved from Indiana to West Palm Beach to seek employment in Palm Beach. (2) Wallace moved from West Palm Beach to Atlanta, Georgia seeking full-time employment. (3) The Breakers regularly employs 25 to 30 students from Dartmouth College in New Hampshire during the winter season. (4) Seasonal residents often travel accompanied by their domestic servants from out-of-state to winter in Palm Beach.

Therefore, this court finds that Palm Beach's registration ordinance does not discriminate against interstate commerce either on its face or in its practical effect but regulates evenhandedly, with only 'incidental' effects on interstate commerce.

Concluding that the ordinance does not discriminate against interstate commerce does not end the inquiry under the commerce clause.[15] The criteria for determining the validity of a state statute which "regulates evenhandedly with only 'incidental' effects on interstate commerce", was set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits....
> If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*See also, Service Machine & Shipbuilding Corp.*, 617 F.2d at 75.

> This standard is basically the same as the test stated by the court in *Hughes* ... but gives more deference to the local

---

15. In *Service Machine & Shipbuilding Corp.*, 617 F.2d at 75, the Court read out the ordinance's facial discrimination against interstate commerce by making the regulation applicable to all seeking employment in the parish in order to give effect to the savings clause. The Court found the registration system could not withstand commerce clause scrutiny and proceeded to analyze the ordinance under *Pike* as if it regulated evenhandedly with only incidental effects on interstate commerce.

interests since it assumes that the challenged law does not discriminate against interstate commerce. In applying this standard, a court must examine the benefits that supposedly result from the local law, and not rely merely on the assertion of an accepted local interest.

*Service Machine & Shipbuilding Corp.,* 617 F.2d at 75.

Palm Beach, like St. Mary parish, "hoped that the ordinance would deter criminals from entering the [Town] as well as aid in their apprehension." *Id.* While the Town's interest is legitimate, the court must look to the benefits that are claimed to flow from the challenged local law. *See, Id.* at 74.

*Putative Local Benefits*

Although it is difficult to quantify, the court finds that a definite local benefit arises in deterring crime, exemplified by the local department store with an annual inventory shrinkage of 7% which dropped to 2% after the 32 employees were sent to register.[16] In addition, the information available to the police department through the registration program assisted in solving two rape-murders in West Palm Beach,[17] the murder of Ralph Walker in Palm Beach and the matter of David Kennedy's death at the Brazilian Court Hotel.

*Burden on Commerce*

The court finds that the Town's objectives then must be balanced against the burdens on interstate commerce.

The registration system here, as in *Service Machine,* 617 F.2d at 75, creates impediments to the free flow of commerce.

First, the information required on the registration form goes beyond that explicitly authorized by the ordinance and creates a burden on interstate commerce. In *Ser-*

*vice Machine,* 617 F.2d at 75–76, the Court said that applicants may refrain from interstate movement if they are required to divulge personal information. The court found the registration procedure intimidating to those who do not want to reveal former incarceration, residence in a mental institution, covert cohabitation, illegitimacy or race. *Id.* The Palm Beach identification form must be distinguished from the one found by the Court of Appeals to be offensive in *Service Machine* in the following respects: it does not require nicknames and aliases, drivers license number and issuing state, home and business telephone numbers, former residences for the past five years, last place of employment, voter registration, and names and addresses of spouse, parents, brothers and sisters. *See Id.* at 75.[18] However, the court finds that the information did create a burden on Plaintiff, Wallace.

Second, the four dollar ($4.00) registration fee creates a burden on interstate commerce. In *Service Machine,* 617 F.2d at 76, the ten dollar ($10.00) registration fee was found to create a definite burden on the movement of migrant labor. Palm Beach's registration fee must be distinguished from the $10.00 fee imposed on low income agricultural workers who travel to harvest crops. Although the Breakers will advance the fee—subject to reimbursement from wages—the court finds that the fee did create a burden, albeit small, on Plaintiff, Wallace.

*Alternatives With a Lesser Impact on Interstate Activities*

"Where the local interest involved could plainly have been promoted with a lesser impact on interstate activities, the state regulation has been held to violate the Commerce Clause." *United States Brew-*

---

**16.** Two employees vanished rather than come in for an identification card and the third, a heroin addict, was terminated.

**17.** In the rape-murders, there were latent fingerprints at the scene and the only fingerprint cards available were the ones given by ID card applicants working in Palm Beach.

**18.** Palm Beach's identification card includes the following information that is the same as that required in *Service Machine:* name, height and weight, social security number, local address, race, sex, hair, and occupation. The following information was required by Palm Beach but not by St. Mary parish in *Service Machine:* employer, date issued, eyes, date and place of birth, next of kin, signature.

*ers Association, Inc. v. Healy*, 692 F.2d 275, 279, (2d Cir.1982), *aff'd*, 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983).

This court finds that "the putative local benefits could be accomplished by less burdensome schemes". *Service Machine*, 617 F.2d at 75–76.

At trial, Plaintiff's expert, Dr. Sheley, suggested numerous less drastic alternatives in lieu of the present registration system. The most plausible alternative is that the current public registration system be converted to a voluntary, private registration system whereby an employer could mandate registration as a condition of employment. The employer could require that employees register, be fingerprinted, photographed and possess identification cards issued by the employer or by a private security company. The records of such registration could be kept by the employer or the private security agency, but this would remain a private matter between employer and employee—not a requirement of law.

The Breakers already utilizes an extensive security program of screening its prospective employees and runs its own ID process, issuing photo identification cards which must be carried on the employee at all times. This system is additional to the municipal i.d. card.

However, under a voluntary system, the police department may be precluded from using the information provided by the applicants to solve local burglaries and thefts, unless the police are able to secure the information from the employer. Although a voluntary private registration system may replace the current one mandated by law, the confidential information previously available only to law enforcement agencies will remain unavailable to private employers.

■ In the instant case, although the ordinance is even-handed on its face, it may not stand because the burden it imposes on commerce is excessive in relation to the legitimate local interests in light of the alternatives available to the Town. This court finds Sections 17–92 and 17–94 invalid as repugnant to the Commerce Clause of the U.S. Constitution and enjoins enforcement thereof.

Despite the obvious benefits to Palm Beach and its many visitors, as well as its residents—and the benefits sometimes to neighboring citizens—this court is bound by *Service Machine* and therefore must hold that Palm Beach's registration ordinance places an impermissible burden on interstate commerce in violation of the Commerce Clause. Consequently, it is unnecessary to address the merits of the other constitutional challenges advanced by Plaintiffs.

Judgment to be entered for Plaintiffs.

## APPENDIX A

### ARTICLE V. REGISTRATION OF CERTAIN OCCUPATIONS

Sec. 17–92. Required.

Every person employed in any nightclub, any place handling liquor, beer or wine in any form, places of amusement, hotels, rooming houses, apartment houses, delivery services, restaurants, bath clubs, bath houses, solariums; all retail sales clerks, lawn maintenance gardeners, janitors, caddies, newspaper delivery boys over the age of seventeen (17) years, domestic servants, taxicab drivers, vending machine operators, and charter boat operators in the town are required to register within forty-eight (48) hours from the time of their employment, in a book of registration kept by the chief of police, and to be also fingerprinted and photographed. (Code 1958, § 21–32)

Sec. 17–93. Duty of employer.

Any person employing any of the persons described in section 17–92, shall require such employees to register within forty-eight (48) hours from the time of their employment as hereinabove required. (Code 1958, § 21–33)

Sec. 17–94. Identification cards.

Identification cards shall be issued to each person registering in accordance with this article, and such identification card

shall be carried on the person obtaining the same at all times. Such identification card shall be sufficient evidence of registration as required hereby. In the event such registration card shall be lost or cannot be produced upon reasonable notice, such person shall promptly re-register and secure a new card from the chief of police. (Code 1958, §§ 21–33, 21–34)