849 F.2d 753
 57 USLW 2010
 In re The BEER INSTITUTE (formerly named United States
Brewers Association, Inc.) as an association, and on behalf
of its following members selling beer in the State of
Connecticut and the bordering States of Massachusetts, New
York and Rhode Island:
Anheuser-Busch, Inc., Miller Brewing Company, Latrobe
Brewing Company, Pabst Brewing Company, The Stroh
Brewery Company.
ANHEUSER-BUSCH, INC.; G. Heileman Brewing Company; the
Genesee Brewing Company Inc., Miller Brewing Company; All
Brand Importers, Inc.; Dribeck Importers, Inc.,
Guiness-Harp Corp.; Labatt Importers, Inc., Martlett
Importing Company, Inc.; Monterey Bay Company, Inc.; and
Van Munching Company, Inc., Plaintiffs-Appellants,
v.
John F. HEALY and David L. Snyder, as Commissioners of the
Department of Liquor Control; and Charles Kasmer,
as Secretary of the Department of Liquor
Control, Defendants-Appellees,
Wine and Spirits Wholesalers of Connecticut, Inc., as an
association, and on behalf of its following
members selling alcoholic liquor in the
State of Connecticut:
Johnny Barton, Inc.; the Brescome Distributors Corporation;
Connecticut Distributors, Inc.; Eder Bros., Inc.; Gallo
Wine Merchants Inc.; Allan S. Goodman, Inc.; and Hartley &
Parker Limited, Inc., Intervenors Defendants-Appellees.
 No. 721, Docket 87-7880.
 United States Court of Appeals,
Second Circuit.
 Argued March 18, 1988.
Decided June 13, 1988.
 
 Jeffrey Glekel, New York City (Timothy G. Reynolds, Skadden, Arps, Slate, Meagher & Flom, New York City, William H. Allen, Covington & Burling, Jerome I. Chapman, Arnold & Porter, Gary Nateman, The Beer Institute, Washington, D.C., of counsel), for plaintiffs-appellants.
 Robert F. Vacchelli, Asst. Conn. Atty. Gen., Newington, Conn. (Joseph I. Lieberman, Conn. Atty. Gen., Richard M. Sheridan, Asst. Conn. Atty. Gen., of counsel), for defendants-appellees.
 William A. Wechsler, Hartford, Conn. (Alfred F. Wechsler, Gregory J. Southworth, Bailey & Wechsler, Hartford, Conn., of counsel), for intervenors defendants-appellees.
 Before TIMBERS, PRATT and MINER, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Plaintiffs-appellants The Beer Institute (formerly United States Brewers Association), an industry association of beer brewers and importers, et al., commenced an action in the United States District Court for the District of Connecticut (Dorsey, J.) against defendants-appellees John F. Healy and David L. Snyder, as Commissioners of the Connecticut Department of Liquor Control, and Charles Kasmer, as Secretary of the Department. The complaint asserted that the amended beer price affirmation provisions of the Connecticut Liquor Control Act, 1984 Conn.Acts 332, 432, and Sec. 30-63a(b) of that Act violate the commerce clause, U.S. Const. art. I, Sec. 8, cl. 3, and the supremacy clause, id. art. VI, cl. 2. Plaintiffs sought declaratory and injunctive relief to prevent enforcement of these provisions.
 
 
 2
 Upon cross-motions for summary judgment, the district court granted judgment for the defendants, holding that the challenged provisions were constitutional. See United States Brewers Ass'n v. Healy, 669 F.Supp. 543 (D.Conn.1987). Plaintiffs appeal from this judgment. Because we find that the amended beer price affirmation provisions place an unconstitutional burden on interstate commerce, we reverse.
 
 BACKGROUND
 
 3
 In United States Brewers Ass'n v. Healy, 692 F.2d 275 (2d Cir.1982) ("Healy I "), aff'd, 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983) (per curiam), we found that the original beer price affirmation provisions of the Connecticut Liquor Control Act placed an unconstitutional burden on interstate commerce. The Act, now as then, requires "posting" of prices, whereby brewers and out-of-state beer importers "file a schedule stating the per-unit price that [they] will charge Connecticut wholesalers for [beer] products in the following month," id. at 276 (footnote omitted); see Conn.Gen.Stat.Ann. Sec. 30-63c (West 1975 & Supp.1988). Posted prices become effective on the first day of the calendar month following the posting. See Conn.Agencies Regs. Sec. 30-6-B12(b). We noted that "[h]istorically the retail price of beer has been generally higher in Connecticut than in its neighboring states, i.e., Massachusetts, New York, and Rhode Island," 692 F.2d at 276.
 
 
 4
 To encourage Connecticut residents to buy beer in-state rather than in the neighboring states, the legislature added beer price affirmation provisions to the Act. These provisions required that: (1) brewers adhere to the posted prices during the one-month period for which they were posted, Conn.Gen.Stat.Ann. Sec. 30-63(c); (2) brewers file a sworn affirmation that their posted per-unit prices would be no higher than their prices in the border states for the same period, id. Sec. 30-63b(b); (3) Connecticut wholesalers be charged per-unit prices by each brewer no higher than the lowest wholesale price the brewer charges in any border state, id. Sec. 30-63a(b); (4) adjustments for rebates, discounts, allowances and any other inducements offered to out-of-state wholesalers be considered in calculating the "lowest" price, id. Sec. 30-63c(b); and (5) brewers offer to Connecticut wholesalers all the sizes and packages of their brands offered to border state wholesalers, id. Because there are no breweries in Connecticut and all beer is shipped into Connecticut from other states, only out-of-state brewers and importers are affected by the Connecticut price affirmation law.
 
 
 5
 In striking down the price affirmation provisions as facially invalid, this court observed that they told "a brewer that for any given month when it sells beer to a wholesaler in Massachusetts, New York, or Rhode Island, it may not do so at a price lower than that it has previously announced it will charge to Connecticut wholesalers," Healy I, 692 F.2d at 282. "Thus," we concluded, "the obvious effect of the Connecticut statute is to control the minimum price that may be charged by a non-Connecticut brewer to a non-Connecticut wholesaler in a sale outside of Connecticut," id., in violation of the commerce clause.
 
 
 6
 Thereafter, the Connecticut Legislature amended the affirmation provisions with the stated purpose of remedying the constitutional problem. Section 30-63b(b) was amended to provide that the "lowest" price charged to border-state wholesalers is determined "at the time of posting," 1984 Conn.Acts 332 ("84-332").[1] At the same time, section 30-63b(e)[2] was added, providing that Sec. 30-63b did not prohibit brewers from changing prices in other states "at any time during the calendar month covered by such posting." However, Sec. 30-63a(b),[3] which prevents brewers from charging Connecticut wholesalers more than their lowest border-state price during the posted period, was not amended. Section 30-63c(b), which establishes how price will be determined under the statute, also was amended by 84-332 to refer to "price ... at the time of posting." Another amendment applicable to Sec. 30-63c(b) contained a conflicting description of price. This amendment permits only differentials in state taxes and actual delivery costs to be excluded from the determination of "the lowest price" charged to any border-state wholesaler "during such posted period," 1984 Conn.Acts 432 ("84-432")[4] (emphasis added), despite the "time of posting" amendment made by 84-332.
 
 
 7
 Appellants commenced this action on July 25, 1984. In their complaint appellants alleged that " 'the interaction of the posting and affirmation provisions' " of 84-332 and Sec. 30-63a(b) " 'not only limits the price at which out-of-state shippers may sell to Connecticut wholesalers, but also sets the lowest price which an out-of-state shipper may charge anywhere in the Border States during the succeeding month,' " 669 F.Supp. at 547 (quoting Complaint at 14). " 'Thus,' " they alleged, " 'as under the original price affirmation scheme, an out-of-state shipper is not free to lower any Border State price below the previously affirmed Connecticut price,' " id. This, they claimed, violated not only the commerce clause, but the supremacy clause as well, "by requiring out-of-state shippers to establish and maintain minimum prices for each item of beer in the four-state area and by precluding them from dealing with any of their customers except on the same or more favorable terms as they dealt with other of their customers," id.
 
 
 8
 The state recognized that Sec. 30-63a(b) " 'standing alone' " seemingly would prevent brewers from lowering the out-of-state prices of products they also sold in Connecticut during the entire month after posting. The state argued, however, that 84-332 made it clear that the price affirmed as the lowest price in the border states need only be effective at the moment of posting: Brewers are free both before and after posting to raise or lower their prices outside Connecticut. (The posted Connecticut price remains in effect for the following calendar month.) The state submitted a Declaration and Ruling of the Connecticut Liquor Control Commission, made pursuant to the Commission's discretionary authority to "issue declaratory rulings as to the applicability of any statutory provision or of any regulation or order of the agency," Conn.Gen.Stat.Ann. Sec. 4-176, providing, inter alia:
 
 
 9
 "[W]e must interpret [Sec. 30-63a(b) ] in light of the obvious intention of the Connecticut General Assembly.... Accordingly, we determine and declare that C.G.S. Sec. 30-63a(b) mandates only that the brewer in a sale to a Connecticut wholesaler not exceed its previously posted price in Connecticut, but that a sale at a price lower in a border state, during the calendar month covered by such posting, does not contravene this section.... To the extent ... that C.G.S. Sec. 30-63a(b) is inconsistent with [Conn.Pub.Act 84-332], it must be considered impliedly repealed since the latest expression of the legislature controls. Thus under the new affirmation scheme an out-of-state shipper is free to lower any border state price below the previously affirmed Connecticut price."
 
 
 10
 669 F.Supp. at 547 n. 9 (quoting Affidavit of the Liquor Commission at 3-4). Thereafter, appellants withdrew their supremacy clause claim. See id. at 548.
 
 
 11
 The district court observed that "[t]he ruling made clear that, whatever the import of Sec. 30-63a(b), out-of-state shippers need only affirm that at the time of posting in Connecticut (and only at the time of posting), their prices to Connecticut wholesalers are no higher than in the border states," id. at 547 (footnote omitted). Judge Dorsey found that "[t]he 1984 amendments to Connecticut's beer affirmation statute make the affirmation statute neither retrospective nor prospective but, rather, contemporaneous," id. at 551-52.[5] He therefore framed the issue as "whether Connecticut's requirement that prices to its wholesalers be fixed by pricing decisions in other states violates the commerce clause," id. at 552.[6]
 
 
 12
 Judge Dorsey had "little doubt that Connecticut's present affirmation law would be constitutional under Seagram [v. Hostetter, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966) ]," id., which upheld a retrospective affirmation requirement that the New York wholesale price was no higher than the lowest price in any other state during the preceding month. However, noting that Seagram had been questioned by the Court in Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), Judge Dorsey held that the affirmation provisions nonetheless were constitutional, both on their face and in their effect, because: (1) "unlike the version in Healy I and Brown-Forman," this statute "leaves brewers free to raise or lower prices in the border states before and after posting in Connecticut and does not, therefore, regulate interstate commerce," 669 F.Supp. at 553; (2) "Connecticut is not seeking lower or better prices for its wholesalers relative to out-of-state wholesalers, but simply equal prices," id.; and (3) the statute "operates even-handedly" and legitimately reduces price discrimination against Connecticut wholesalers, id. Holding the amended price affirmation provisions constitutional, he stated, "comports with the presumption of validity to which all economic regulatory legislation is entitled" and "with the spirit of the twenty-first amendment, which was intended to return broad control of the liquor industry to the states," id. at 552.
 
 
 13
 On appeal, appellants, as they did in Healy I, "have launched an all-out attack on the Connecticut beer price affirmation provisions under the [c]ommerce [c]lause," 692 F.2d at 281, contending that the provisions are protectionist in purpose and effect, are subverted by the Brown-Forman decision because it has "significantly undermine[d]" the precedential authority of Seagram, and operate to regulate beer prices in the border states in violation of the commerce clause and in excess of Connecticut's regulatory powers under the twenty-first amendment. Because we agree that the realities of beer price regulation in the border state area show that Connecticut's statute inevitably exercises control over "the prices set for sales occurring wholly outside its territory," id. at 282, we do not reach the issue of economic protectionism. Accordingly, we hold that the amended Connecticut beer price affirmation provisions directly regulate interstate commerce in violation of the Constitution.
 
 DISCUSSION
 A. Commerce Clause
 
 14
 The commerce clause generally forbids "[s]tate regulation that is designed to confer economic benefits on [its] businesses and residents ... at the expense of businesses and residents of other states," Healy I, 692 F.2d at 279; see, e.g., Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 350-53, 97 S.Ct. 2434, 2445-46, 53 L.Ed.2d 383 (1977). However, "the fact that the law may not have been intended as protectionist or discriminatory will not save it" when the "effect of a state's law is to regulate conduct occurring wholly outside the state," Healy I, 692 F.2d at 279; see, e.g., Edgar v. MITE Corp., 457 U.S. 624, 642-43, 102 S.Ct. 2629, 2640-41, 73 L.Ed.2d 269 (1982) (opinion of White, J.); Southern Pacific Co. v. Arizona, 325 U.S. 761, 775, 65 S.Ct. 1515, 1523, 89 L.Ed. 1915 (1945); Shafer v. Farmers' Grain Co., 268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925). Thus, "[w]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests," it generally is invalidated "without further inquiry," Brown-Forman, 476 U.S. at 579, 106 S.Ct. at 2084; see, e.g., City of Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). When a statute only indirectly affects interstate commerce and regulates evenhandedly, the inquiry is "whether the [s]tate's interest [in regulation] is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits," Brown-Forman, 476 U.S. at 579, 106 S.Ct. at 2084; see Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).
 
 
 15
 The Supreme Court has emphasized that whether the regulation is direct or indirect, "the critical consideration is the overall effect of the statute on both local and interstate activity," Brown-Forman, 476 U.S. at 579, 106 S.Ct. at 2084; see Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 440-41, 98 S.Ct. 787, 793-94, 54 L.Ed.2d 664 (1978), and the interaction of the statute with the regulatory schemes of neighboring states constitutes an "overall effect" which appropriately is considered. See Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 671, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981) (plurality) (Iowa law prohibiting 65-ft. double-trailer trucks "now out of step with the laws of all other Midwestern and Western States"); Raymond Motor Transp., 434 U.S. at 445, 98 S.Ct. 796 (Wisconsin double-truck length limitations prevented interline transfers "from carriers that operate only in the 33 States where the doubles are legal"); Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 527-28, 79 S.Ct. 962, 966-67, 3 L.Ed.2d 1003 (1959) (interference with interline transfers by unique Illinois mudguard law); Southern Pacific Co., 325 U.S. at 774-75, 65 S.Ct. at 1522-23 (1945) (Arizona train-length law effectively "control[led] train operations beyond the boundaries of the state" by requiring dismantling and reforming of interstate trains at state line); see also Silver v. Woolf, 694 F.2d 8, 14 (2d Cir.1982), cert. denied, 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983).
 
 
 16
 The district court found that the amended Connecticut beer price affirmation provisions do not regulate interstate commerce because they do not prohibit brewers from raising or lowering beer prices in the border states prior to, or following, the Connecticut posting. However, the court did not examine whether in fact the interaction of the Connecticut provisions with the beer price regulations of bordering states would allow such pricing flexibility. Since Connecticut has chosen to regulate beer prices in reference to the regulated prices in the border states, it is particularly appropriate to examine the effect of the Connecticut beer price affirmation provisions resulting from their interaction with the regulatory schemes of the border states. See Brown-Forman, 476 U.S. at 580, 583-84, 106 S.Ct. at 2086-87.
 
 
 17
 The Massachusetts beer pricing scheme requires brewers to post prices by the first day of the month to become effective on the first day of the following calendar month. These posted prices cannot be changed by the brewer. See Mass.Ann.Laws ch. 138, Sec. 25B(d) (Law.Co-op.1981). As interpreted by the Liquor Control Commission, the Connecticut law requires brewers to affirm that the beer prices they post, at 10:00 a.m. on the sixth day of each month, see Conn.Agencies Regs. Sec. 30-6-B4a, are no higher than the prices that the brewer is then charging in the border states.
 
 
 18
 Thus, for example, a brewer who posts his February prices for Massachusetts on January 1 must look ahead to the posting and affirmation of his March prices on February 6 in Connecticut. The February prices that he posts in Massachusetts on January 1 will be effective and unchangeable at the time he must post and affirm his Connecticut prices for March on February 6. Therefore, the brewer cannot post a price in Massachusetts that is lower than the price he plans to post over a month later in Connecticut. In this way, a brewer posting his next-month's beer prices in Massachusetts does so under the restriction of Connecticut's affirmation law, which requires that the Connecticut price not be "higher than the lowest price at which such item is then being sold or offered for sale or shipped ... to any wholesaler" in a border state, Conn.Gen.Stat.Ann. Sec. 30-63a(b). Moreover, the price that the brewer posts in Massachusetts, as he looks ahead to the Connecticut affirmation day, will be effective not merely on that day, but for that entire month in Massachusetts. A brewer can therefore undertake competitive pricing based on the market realities of either Massachusetts or Connecticut, but not both, because the Connecticut statute ties pricing to the regulatory schemes of the border states.
 
 
 19
 In New York, a price that is decreased "per case, draft package or special package of beer sold to beer wholesalers" cannot be raised for at least 180 days. See N.Y.Alco.Bev.Cont.Law Sec. 55-b(2) (McKinney 1987). A brewer who plans to decrease his New York prices on a particular beer package, like the brewer posting his prices in Massachusetts, is confronted with the Connecticut posting and affirmation requirements. Once a price decrease becomes effective in New York, that price will control the price he may offer in Connecticut. On the sixth day of each month in which the New York price reduction is effective, the Connecticut statute will not allow the brewer to charge a higher price in Connecticut for the following month, no matter what the market realities would otherwise dictate. Thus, a brewer could not raise his Connecticut price above the New York level for a total of six calendar months, because the Connecticut statute, in effect, makes the New York pricing decision a decision for Connecticut as well. In addition, the Connecticut affirmation day falling in the last month of the New York price decrease would give Connecticut the benefit of the decreased price for a calendar month beyond the date that it terminates in New York. Clearly this restricts a brewer's ability to promote a beer in New York that also is sold in Connecticut. Moreover, a brewer who sells in both markets would be severely hampered in his ability to respond to market forces, particularly to the competitive demands of the New York City market, the most competitive and lowest priced market in the four-state region, see 669 F.Supp. at 546.
 
 
 20
 Both the Massachusetts and New York statutes provide for administrative exemptions from the beer pricing laws. See Mass.Ann.Laws ch. 138, Sec. 25B(d) (exemption only by "written permission of the [Alcoholic Beverages] [C]ommission ... granted for good cause shown and for reasons not inconsistent with the purpose of this chapter"); N.Y.Alco.Bev.Cont.Law Sec. 55-b(3)(c) ("for good cause shown to its satisfaction" Liquor Authority "may grant waivers to licensees adversely affected by this section"). However, the possibility that an administrative agency may in its discretion grant a deviation from regulatory requirements cannot save the Connecticut statute or shift the responsibility for its effects upon the regulatory bodies of other states. As the Court observed in Brown-Forman, "[w]e would not solve the constitutional problems inherent" in Connecticut's amended affirmation provisions "by indulging the ... assumption that the [Liquor] Authority will be sensitive to [c]ommerce [c]lause concerns.... The protections afforded by the [c]ommerce [c]lause cannot be made to depend on the good grace of a state agency," 476 U.S. at 582 n. 5, 106 S.Ct. at 2086 n. 5.
 
 
 21
 Connecticut's affirmation provisions also regulate beer prices in another way: restricting a brewer's ability to offer volume discounts in the border states. While volume discounting is unlawful in Connecticut, see Conn.Gen.Stat.Ann. Sec. 30-63(b), it is not generally prohibited in the border states. Brewers complying with the Connecticut affirmation statute must affirm that their prices for the entire state are no higher than any volume-discounted prices offered in competitive border-state markets. The effect of the Connecticut statute is to restrict a brewer's ability to offer volume discounts in competitive markets of the border states since the brewer could then not charge a higher price in the less competitive Connecticut market. In this way, as well, the Connecticut statute regulates pricing in other states.
 
 
 22
 Connecticut urges us to uphold the statute under Seagram. However, Connecticut can find no solace in Seagram. We observed in Healy I that "the holding in Seagram might well validate beer price regulation less intrusive than the" former Connecticut affirmation provisions, "such as a requirement simply that a brewer set its Connecticut prices at the lowest levels it chooses to set in the surrounding states," 692 F.2d at 283-84. We did not thereby endorse regulation which had the effect of controlling wholesale beer prices in other states. In fact, we indicated that the validity of such an amended scheme turned on its "leaving those out-of-state prices unregulated by Connecticut," id. at 284.
 
 
 23
 Moreover, the Court has cast doubt upon the continuing validity of the principles underlying Seagram. The Brown-Forman majority did "not necessarily attach constitutional significance to the difference between a prospective statute," such as the one it struck down, "and the retrospective statute at issue in Seagram." 476 U.S. at 584 n. 6, 106 S.Ct. at 2087 n. 6. The Court recognized that "one could argue that the effects of the statute in Seagram do not differ markedly from the effects of the statute at issue in the present case" but declined to "consider the continuing validity of Seagram " since no retrospective statute was before the Court. Id. Writing separately, Justice Blackmun would have overruled Seagram as "a relic of the past" decided "when affirmation statutes were comparatively new and long before the proliferation of overlapping and potentially conflicting affirmation statutes," id. at 586, 106 S.Ct. at 2088 (Blackmun, J., concurring). He saw "no principled distinction" between the two types of statutes because both, "despite one's best efforts at fine-tuning, operat[e] to affect out-of-state transactions and violat[e] the [c]ommerce [c]lause," id.; Note, Liquor Price Affirmation Statutes and the Dormant Commerce Clause, 86 Mich.L.Rev. 186, 188 (1987) (concluding "that all liquor price affirmation statutes violate the commerce clause").
 
 
 24
 We, of course, are not empowered to overrule Supreme Court precedent. However, we clearly perceive that the basis of the Seagram decision has been eroded and that the Court has indicated strongly that Seagram may not survive the decision in Brown-Forman. In fact, the Seagram court recognized that it perhaps had not had the last word, observing that there would be "time enough to assess the alleged extraterritorial effects" of affirmation statutes "when a case arises that clearly presents them," 384 U.S. at 43, 86 S.Ct. at 1260. This is such a case. Accordingly, we decline to extend the Seagram precedent to validate a simultaneous affirmation provision that, by its purposeful interaction with border-state regulatory schemes, operates to control prices beyond Connecticut's borders.
 
 B. Twenty-First Amendment
 
 25
 Connecticut maintains that the beer price affirmation provisions represent a valid exercise of its power under the twenty-first amendment "to regulate, or prohibit entirely, the transportation or importation of intoxicating liquor within [its] borders," 324 Liquor Corp. v. Duffy, 479 U.S. 335, 107 S.Ct. 720, 726, 93 L.Ed.2d 667 (1987). However, "[i]t is well settled that the [t]wenty-first [a]mendment did not entirely remove state regulation of alcohol from the reach of the [c]ommerce [c]lause." Brown-Forman, 476 U.S. at 584, 106 S.Ct. at 2087. The amendment reserves to states power to regulate " 'transportation or importation ' " of liquor " 'into any [s]tate ... for delivery or use therein,' " Healy I, 692 F.2d at 281 (emphasis added), but in no way "modifies the traditional [c]ommerce [c]lause principles that bar a state from regulating the transport, sale, or use of products outside of its own territory," id. Thus, our conclusion that the Connecticut statute acts as a direct regulation of beer pricing in other states sufficiently disposes of this issue. See Brown-Forman, 476 U.S. at 585, 106 S.Ct. at 2088. Moreover, the extraterritorial effect of Connecticut's affirmation provisions, particularly as to volume discounting, "may interfere with the ability of other [s]tates to exercise their own authority under the [t]wenty-first [a]mendment" by impinging upon their "regulatory goals" or by "depriv[ing] their citizens of the opportunity to purchase brands of liquor that are sold" in Connecticut, id.
 
 CONCLUSION
 
 26
 In light of the foregoing, we hold that the amended Connecticut beer price affirmation provisions directly regulate interstate commerce in violation of the commerce clause. Accordingly, we reverse the judgment of the district court and remand for entry of judgment in favor of plaintiffs.
 
 
 
 [1]
 As amended by 1984 Conn.Acts 332, Sec. 30-63b(b) provides:
 At the time of posting of the bottle, can, keg or barrel and case price required by section 30-63, every holder of a manufacturer or out-of-state shipper's permit, or the authorized representative of a manufacturer, shall file with the department of liquor control a written affirmation under oath by the manufacturer or out-of-state shipper of each brand of beer posted certifying that, at the time of posting, the bottle, can or case price, or price per keg, barrel or fractional unit thereof, to the wholesaler permittees is no higher than the lowest price at which each such item of beer is sold, offered for sale, shipped, transported or delivered by such manufacturer or out-of-state shipper to any wholesaler in any state bordering this state.
 
 
 [2]
 As added by 1984 Conn.Acts 332, Sec. 30-63b(e) provides:
 This section shall not prohibit a manufacturer or out-of-state shipper permittee or the authorized representative of a manufacturer from changing prices to any wholesaler in any other state of the United States or in the District of Columbia, or to any state or agency of a state which owns and operates retail liquor outlets at any time during the calendar month covered by such posting.
 
 
 [3]
 Section 30-63a(b) provides:
 No holder of any manufacturer or out-of-state shipper's permit shall ship, transport or deliver within this state, or sell or offer for sale to a wholesaler permittee any brand of beer as defined in section 30-1, at a bottle, can or case price, or price per keg, barrel or fractional unit thereof, higher than the lowest price at which such item is then being sold or offered for sale or shipped, transported or delivered by such manufacturer or out-of-state shipper to any wholesaler in any state bordering this state.
 
 
 [4]
 1984 Conn.Acts 432 provides in pertinent part:
 In determining the lowest price for which any item of beer is or was sold, offered for sale, shipped, transported or delivered during such posted period by any manufacturer or out-of-state shipper to a wholesaler in any state bordering this state, [only differentials in price attributable to differences in state taxes and to delivery costs are permissible].
 
 
 [5]
 A "retroactive" affirmation statute "require[s] prices to an in-state wholesaler to be at the lowest price at which the product was sold elsewhere during an earlier time period." Brown-Forman Corp. v. New Mexico Dep't of Alco. Bev. Cont., 672 F.Supp. 1383, 1385 (D.N.M.1987). "Prospective" affirmation "uses as its reference point the price for out-of-state sales of liquor in the future." Id. A "simultaneous" (also known as "contemporaneous" or "concurrent") affirmation requires that "at the moment " of posting or sale the price to the in-state wholesaler "matches the lowest price at which the product is being sold elsewhere." See id.; see also Note, Liquor Price Affirmation Statutes and the Dormant Commerce Clause, 86 Mich.L.Rev. 186, 190 n. 31 (1987) ("Simultaneous statutes ... represent a subdivision of the prospective category," retaining its "future-price orientation" but allowing "freedom to change [out of state] prices after the schedule's effective month has begun.")
 
 
 [6]
 Several courts have found that simultaneous price affirmation statutes directly regulate out-of-state liquor prices in violation of the commerce clause. See Brown-Forman Corp. v. New Mexico Dep't of Alco. Bev. Cont., 672 F.Supp. 1383 (D.N.M.1987); Brown-Forman Corp. v. Tennessee Alco. Bev. Comm'n, No. 3-86-0926, slip op. (M.D.Tenn. June 30, 1987); Brown-Forman Corp. v. South Carolina Alco. Bev. Comm'n, 643 F.Supp. 943 (D.S.C.1986). The affirmation required by these statutes, however, was not simultaneous with posting, but rather with each sale: Brewers were required to affirm that "at the moment of sale " the price to the in-state wholesaler "matches the lowest price at which the product is being sold elsewhere," Brown-Forman, 672 F.Supp. at 1385. See Brown-Forman, slip op. at 2; Brown-Forman, 643 F.Supp. at 947