860 F.2d 1354
 57 USLW 2313
 BROWN-FORMAN CORPORATION, Plaintiff-Appellee,
v.
TENNESSEE ALCOHOLIC BEVERAGE COMMISSION, et al.,
Defendants-Appellants (87- 5913),
Licensed Beverage Wholesalers of Tennessee,
Intervenor-Appellant (87-5870).
 Nos. 87-5870, 87-5913.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 3, 1988.
Decided Nov. 4, 1988.
 
 W.J. Michael Cody, Atty. Gen. of Tennessee, Barry Turner, argued, Nashville, Tenn., for defendants-appellants.
 Robert L. DeLaney, Henry E. Hildebrand, III, Jane P. North, Michael J. Passino, Passino, DeLaney and Hildebrand, Nashville, Tenn., for intervenor-appellant.
 L. Webb Campbell, Dearborn & Ewing, Nashville, Tenn., Robert L. Echols, argued, for plaintiff-appellee.
 Douglas W. Metz, Washington, D.C., for amicus curiae, Wine and Spirits Wholesalers of America, Inc.
 Before KRUPANSKY and NELSON, Circuit Judges, and HACKETT, District Judge.*
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 The laws of the State of Tennessee prohibit any distiller from making a sale of alcoholic beverages to a wholesaler in Tennessee at a price higher than that being charged, contemporaneously with the Tennessee sale, to a wholesaler in any other state. Tenn.Code Ann. Sec. 57-3-202(e). The Tennessee statute leaves distillers free to change their out-of-state prices at will, without notice and without the approval of any Tennessee official.
 
 
 2
 Plaintiff Brown-Forman Corporation, a distiller and national marketer of alcoholic beverages, brought the present action to obtain a declaratory judgment on the constitutionality of the Tennessee statute. In Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), the Supreme Court had recently invalidated a New York liquor-pricing statute which was geared to out-of-state prices that had to be certified in advance, and which made it illegal to change the out-of-state prices without New York's approval. Relying principally upon that decision, the district court held that on its face the Tennessee statute violates the Commerce Clause of the United States Constitution.[1] In our opinion, however, the Tennessee law lacks the obvious extraterritorial reach that the New York statute had, and we do not believe the Tennessee statute runs afoul of the negative implications of the Commerce Clause. We are strengthened in this conclusion by the implications of the Twenty-first Amendment, with its constitutional prohibition against the transportation of intoxicating liquors into any state for use in that state "in violation of the laws thereof."
 
 
 3
 * In considering whether the Tennessee liquor-pricing law goes further than the Constitution allows, it is important to understand not only what the law says, but also what it does not say. Unlike the "affirmation" laws of many other states, the Tennessee statute does not require distillers to affirm that they will comply with price schedules posted in advance.[2] The Tennessee statute does not require any posting of prices. It does not impose any waiting period before prices can be changed. It does not purport to control the timing or amount of out-of-state price changes. And it does not require that governmental approval be obtained before prices are changed within the state, just as it does not require governmental approval before prices are changed outside the state.
 
 
 4
 All the Tennessee statute does, in essence, is tell distillers that when they sell or offer to sell liquor to a wholesaler in Tennessee, they may not willfully charge or quote a price in excess of any wholesale price currently being charged or quoted by the distiller outside the state. The mechanism by which Tennessee guards against such price discrimination is as follows:
 
 
 5
 --Before offering any brand of alcoholic beverage for sale to any licensed wholesaler in Tennessee, every manufacturer, distiller, broker, or vintner of any such beverage is required to file with Tennessee's Alcoholic Beverage Commission an "affirmation of corporate policy." Tenn.Code Ann. Sec. 57-3-202(e)(1).
 
 
 6
 --The "affirmation of corporate policy" must certify that the seller will "not willfully sell or offer for sale any alcoholic ... beverages of a particular brand, proof or size, in Tennessee at a price higher than the price [at which] such liquors are sold or offered for sale to licensed wholesalers in any other state in the United States." Id., Subsection (2).[3]
 
 
 7
 --The term "price" is defined as "platform price at the distillery." Price differentials based on transportation costs are expressly allowed, as are nondiscriminatory quantity discounts. Id., Subsection (3). The Alcoholic Beverage Commission also interprets the statute as allowing "promotional discounts"--no-strings credits given to the wholesaler for promotion of the distiller's brands.
 
 
 8
 --The making of a false affirmation, the failure to file a required affirmation, or the willful violation of the pledges contained therein, may be punished as a misdemeanor and may result in suspension or revocation of the privilege to import and sell alcoholic beverages in Tennessee. Id., Subsections (4) and (5).
 
 
 9
 The Tennessee statute was enacted in 1975. In June of 1986 the United States Supreme Court handed down its decision in Brown-Forman, supra, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552. The following month Brown-Forman sent the Tennessee Alcoholic Beverage Commission a two paragraph letter stating, in pertinent part:
 
 
 10
 "The U.S. Supreme Court's recent decision (Brown-Forman Distillers Corporation v. New York State Liquor Authority No. 84-2080 [sic], decided June 3, 1986) [106 S.Ct. 2080], declaring New York's affirmation statute unconstitutional is applicable to the affirmation law of all states and, accordingly, the existing affirmation is hereby withdrawn." (Emphasis in original.)The Commission forwarded the letter to the Attorney General of Tennessee, requesting an opinion on the issue raised by Brown-Forman. The Attorney General responded with a seven-page opinion letter explaining why Tennessee's statute is distinguishable from New York's and concluding that the Tennessee statute does not contravene the Commerce Clause. The Commission accepted the Attorney General's conclusion, and Brown-Forman was so advised.
 
 
 11
 Brown-Forman thereupon sued the Commission in the United States District Court for the Middle District of Tennessee, asserting that Tenn.Code Ann. Sec. 57-3-202(e) is unconstitutional and requesting declaratory and injunctive relief. After a two-day trial the district court filed a memorandum opinion holding the statute "facially unconstitutional because of its effect on interstate commerce." The opinion was accompanied by an order permanently enjoining enforcement of the statute. This appeal followed.
 
 II
 
 12
 Whatever the effect on interstate commerce of a state statute prohibiting sales of liquor at discriminatory prices, it could hardly be more direct or more profound than the effect of prohibiting sales of liquor altogether. No state currently does that--notwithstanding William Allen White's tongue-in-cheek prediction that "Kansans will vote dry as long as they can stagger to the polls"--but under the second section of the Twenty-first Amendment,[4] every state may do so. The negative implications of the Commerce Clause notwithstanding, every state has "virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system." California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97, 110, 100 S.Ct. 937, 946, 63 L.Ed.2d 233 (1980). The Twenty-first Amendment thus "directly qualifies the federal commerce power," as the Supreme Court recently noted, despite the fact that "the Court has rejected the view 'that the Twenty-first Amendment has somehow operated to "repeal" the Commerce Clause wherever regulation of intoxicating liquors is concerned.' " 324 Liquor Corp. v. Duffy, 479 U.S. 335, 346, 107 S.Ct. 720, 727, 93 L.Ed.2d 667 (1987), quoting Hostetter v. Idlewild Liquor Corp., 377 U.S. 324, 331-32, 84 S.Ct. 1293, 1298, 12 L.Ed.2d 350 (1964). (What the Idlewild case made clear, as Mr. Justice Stewart said in Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 42, 86 S.Ct. 1254, 1259, 16 L.Ed.2d 336 (1966), was that "the Twenty-first Amendment has not operated totally to repeal the Commerce Clause in the area of the regulation of traffic in liquor.")
 
 
 13
 Even where products other than liquor are concerned, state regulation that falls short of complete prohibition does not necessarily impose an impermissible burden on interstate commerce merely because it discourages some out-of-state manufacturers from selling within the state, to the injury of the consuming public. Exxon Corp. v. Maryland, 437 U.S. 117, 127-28, 98 S.Ct. 2207, 2214-15, 57 L.Ed.2d 91 (1978). But even in the case of alcoholic beverages, no state is entitled to regulate sales in other states. It is not up to Tennessee to decide whether the sale and consumption of liquor will be prohibited in Kentucky, for example. Whether extraterritorial regulation is ruled out by the negative implications of the Commerce Clause or by "the structure of the Constitution as a whole," as Professor Donald H. Regan argues in his "Siamese Essays," 85 Mich.L.Rev. 1865 and 1884 (1987), it is well settled that although a state "may regulate the sale of liquor within its borders, and may seek low prices for its residents, it may not 'project its legislation into [other States] by regulating the price to be paid' for liquor in those States." Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573, 582-83, 106 S.Ct. 2080, 2086, 90 L.Ed.2d 552, 562 (1986) (quoting Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 521, 55 S.Ct. 497, 499, 79 L.Ed. 1032 (1935)).
 
 
 14
 First and foremost among the questions presented in the case at bar, then, is whether Tennessee has projected its legislation into other states by "regulating" the price to be paid for liquor there. If it has, the district court was correct in holding the legislation unconstitutional.
 
 III
 
 15
 At trial, Brown-Forman presented evidence characterized by the district court as suggesting that Tennessee's statute "distorts the market forces of supply and demand, prevents the use of aggressive price promotion as a marketing tool to attain profit maximization and also impairs the ability to introduce new products in other states." A witness for Brown-Forman maintained that it "was rarely a feasible option" for the company to try to improve out-of-state sales of a slow-moving item by cutting out-of-state prices, because the Tennessee statute would require a corresponding cut in prices in Tennessee even if the item should already be selling well in Tennessee.
 
 
 16
 The evidence presented by Brown-Forman did not quantify the market distortions attributed to the Tennessee statute. In terms of dollars and cents, both the practical effect of the statute on Brown-Forman's bottom line and the practical effect of the statute on the pocketbooks of consumers within and without the state remain unknown. The district court thought it clear, nonetheless, that the inevitable tendency of the Tennessee statute would be to control prices in other states:
 
 
 17
 "It is clear that if a liquor distiller, such as plaintiff, desires to raise its prices in Tennessee, it must raise its price first in every other state in which the product is sold. Tennessee's affirmation statute works to deny consumers in other states the benefits of a free competitive market...."
 
 
 18
 This is the basis for the district court's conclusion that the statute is unconstitutional.
 
 IV
 
 19
 We agree with the district court that if a distiller desires to raise prices in Tennessee, the statute clearly prevents that desire from being gratified unless prices are raised simultaneously wherever the product in question is being sold outside the state. But paraphrasing an observation made by Mr. Justice Stewart in Seagram, "[i]t is by no means clear ... that [Tenn.Code Ann. Sec. 57-3-202(e) ] must inevitably produce higher prices in other States ... rather than the lower prices sought for [Tennessee]." 384 U.S. at 43, 86 S.Ct. at 1260. It is impossible to tell from the record of this case to what extent Brown-Forman may actually have raised out-of-state prices in order to indulge a desire to raise prices in Tennessee, just as it is impossible to determine to what extent Brown-Forman may actually have refrained from lowering prices outside Tennessee in order to avoid having to lower prices within Tennessee. Nevertheless, if the price elasticity of demand for different types of liquor varies significantly in different parts of the country--and the record suggests that it probably does--we agree that the natural tendency of the Tennessee statute is to impair the efficiency of the interstate liquor market and to deprive consumers of the benefits, if that is the word, of access to the most liquor for the least money.
 
 
 20
 As noted above, however, such market distortions would not necessarily mean that the statute is unconstitutional, even if the products in question were not covered by the Twenty-first Amendment. See Exxon Corp. v. Maryland, supra, 437 U.S. 117, 98 S.Ct. 2207. "The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within the domain which the Constitution forbids." Osborn v. Ozlin, 310 U.S. 53, 62, 60 S.Ct. 758, 761, 84 L.Ed. 1074 (1940). And the Tennessee statute has not been shown likely to produce greater distortions in the interstate market than would a statute prohibiting Tennessee liquor sales altogether.
 
 
 21
 The question before us is not whether Tennessee's liquor-pricing statute is likely to have "repercussions" on liquor prices in other states, but whether Tennessee has actually undertaken to "regulate" liquor prices in other states. See Brown-Forman, 476 U.S. at 580, 106 S.Ct. at 2085, where the Court, speaking through Justice Marshall, said that the inquiry "must center on whether New York's affirmation law regulates commerce in other States." (Emphasis supplied.)
 
 
 22
 In Brown-Forman, the distiller argued that the New York statute not only tended to make it more costly to reduce prices in other states, but actually "makes it illegal for a distributor to reduce its price in other states during the period that the posted New York price is in effect." Id. at 579-80, 106 S.Ct. at 2084-85. (Emphasis supplied.) The Supreme Court agreed that this was precisely how the New York statute worked, and the Court held, not surprisingly, that a statute making it illegal to reduce out-of-state prices is a statute that "directly regulates" such prices in violation of the Constitution:
 
 
 23
 "Once a distiller has posted prices in New York, it is not free to change its prices elsewhere in the United States during the relevant month.[5] Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce." 476 U.S. at 582, 106 S.Ct. at 2086.[5]
 
 
 24
 The case at bar presents a very different situation from that presented in the Supreme Court's Brown-Forman case. Here the distiller is not arguing that the statute in question makes it "illegal" for a distiller to reduce its prices in other states without permission, and there is no conceivable basis on which a court could attribute such an effect to the Tennessee statute. All the distiller can argue here is that the Tennessee statute tends to discourage out-of-state price reductions--because such price reductions must be replicated in Tennessee--just as the statute tends to encourage price increases outside Tennessee, because Tennessee prices cannot be raised without raising foreign prices as well. Price moves as such are not illegal anywhere, as far as Tennessee is concerned, although they may be more costly, from the distiller's standpoint, than they would be in the absence of the statute.
 
 V
 
 25
 The teaching of the Supreme Court's decision in Seagram, as we understand it, is that a tendency to increase the distiller's out-of-state costs is simply not enough to convert an otherwise constitutional state liquor law into an impermissible "regulation" of out-of-state liquor prices.
 
 
 26
 Seagram dealt with a New York statute that required distillers and other owners of liquor brands to file monthly price schedules accompanied by an affirmation that the price of each item listed on the schedule was "no higher than the lowest price at which such item of liquor was sold by such brand owner ... to any wholesaler anywhere in any other state ... at any time during the calendar month immediately preceding the month in which such schedule is filed." Chapter 531, 1964 Session Laws of New York, Sec. 9, as quoted in Seagram, 384 U.S. at 35, 86 S.Ct. at 1255. The New York statute was thus more restrictive than the Tennessee statute. Under the New York statute a distiller could not lower wholesale prices anywhere outside New York without locking itself into a correspondingly low price in New York for all of the next month, while the Tennessee law has no comparable effect. If the New York statute did not constitute "regulation" of out-of-state prices, therefore, it follows a fortiori that the Tennessee statute does not constitute such regulation.
 
 
 27
 The Supreme Court recognized in Seagram, just as it did in Brown-Forman, "that the most important issue was whether the statute regulated out-of-state transactions." Brown-Forman, 476 U.S. 581, 106 S.Ct. at 2085, referring to Seagram, 384 U.S. at 42-43, 86 S.Ct. at 1259-60. And the Supreme Court concluded, in Seagram, that
 
 
 28
 "The mere fact that Sec. 9 is geared to appellants' pricing policies in other States is not sufficient to invalidate the statute. As part of its regulatory scheme for the sale of liquor, New York may constitutionally insist that liquor prices to domestic wholesalers and retailers be as low as prices offered elsewhere in the country." (Emphasis supplied.)
 
 
 29
 If Seagram is still good law, this means that Tennessee "may constitutionally insist that liquor prices to domestic wholesalers ... be as low as prices offered elsewhere in the country." That, and nothing more than that, is what Tennessee has done in the statute before us.
 
 
 30
 While the natural tendency of the New York law to increase out-of-state costs would seem to have been just as apparent on its face as is the corresponding tendency of the Tennessee statute, the Seagram opinion does mention that the actual effects of the New York statute on the distiller's business outside the state were "largely matters of conjecture." The court noted that it would be time enough to assess the actual effects of the New York law "when a case arises that clearly presents them." 384 U.S. at 43, 86 S.Ct. at 1260. Seagram was not that case, and the court merely held that the statute was not unconstitutional on its face.
 
 
 31
 The record in the case at bar confirms that the natural tendency of the Tennessee statute is to increase costs outside of Tennessee, but like the record in Seagram, it does not quantify the costs involved. Perhaps this is one of the reasons why the district court thought that the issue before it was "whether the [Tennessee] affirmation statute, on its face, violates the Commerce Clause of the United States Constitution." (Emphasis supplied.) In holding that the Tennessee statute does, "on its face," violate the Commerce Clause, the district court gave an answer diametrically opposed to the answer given by the Supreme Court in Seagram.
 
 VI
 
 32
 It is true, as the Court of Appeals for the Second Circuit recently had occasion to observe, that the Supreme Court's opinion in Brown-Forman, and Justice Blackmun's concurrence in that case, have "cast doubt upon the continuing validity of the principles underlying Seagram." In re The Beer Institute, 849 F.2d 753, 760 (2d Cir.1988). It is also true, however, that courts of appeals "are not empowered to overrule Supreme Court precedent." Id. Only the Supreme Court can do that--and the last time the Supreme Court had an opportunity to overrule Seagram, it declined to do so. Because a Seagram-like statute was not before the Court in Brown-Forman, the Brown-Forman court simply said that "we need not consider the continuing validity of Seagram." Brown-Forman, 476 U.S. 584 n. 6, 106 S.Ct. at 2087 n. 6.
 
 
 33
 On its face, the Tennessee statute seems calculated to affect interstate commerce less drastically than the statute that was upheld in Seagram. If the Supreme Court should wish to decide whether Seagram is still valid, therefore, this would probably be a good case in which to do it. If not, we assume that lower courts ought to follow Seagram in every case to which that decision obviously applies.
 
 
 34
 The Second Circuit's interpretation of the Seagram decision does not necessarily differ from ours. See United States Brewers Association, Inc. v. Healy, 692 F.2d 275, 283-84 (2d Cir.1982), affirmed without opinion, 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983):
 
 
 35
 "Given the latitude allowed a state under the Twenty-first Amendment to regulate the sale of liquor within its own borders, the holding in Seagram might well validate ... a requirement simply that a brewer set its Connecticut prices at the lowest levels it chooses to set in the surrounding states, see 384 U.S. at 43-45, 86 S.Ct. at 1260-1261, leaving those out-of-state prices unregulated by Connecticut. But nothing in Seagram purports to rule that a state may achieve its goal of price-parity by the far more drastic, and clearly excessive, method of controlling the minimum prices at which liquor may be sold outside of its own territory."
 
 
 36
 The Connecticut statute that was held unconstitutional in Healy told a brewer "that for any given month when it sells beer to a wholesaler in Massachusetts, in New York, or in Rhode Island, it may not do so at a price lower than that it has previously announced it will charge to Connecticut wholesalers." Id. at 282. The Tennessee statute, in contrast, exercises no control over out-of-state prices; it simply requires that a distiller set its Tennessee prices at the lowest levels it chooses to set in other states. That requirement, as the Second Circuit acknowledged, "may well" be validated by the holding in Seagram.
 
 
 37
 The Connecticut statute considered by the Second Circuit in Beer Institute was an amended version of the one invalidated in Healy. The Connecticut legislature had attempted to fix the statute up along the lines laid out in Healy, but the court thought the job had been bungled. Beer Institute, 849 F.2d at 755-56. Read in conjunction with the liquor laws of the surrounding states, the Connecticut statute still exercised control, "inevitably," over out-of-state prices. Id. at 758. The Beer Institute court declined "to extend the Seagram precedent to validate a simultaneous affirmation provision that, by its purposeful interaction with border-state regulatory schemes, operates to control prices beyond Connecticut's borders." Id. at 760-61.
 
 VII
 
 38
 In the case at bar there has been no claim that the Tennessee affirmation statute was designed to interact with the statutes of other states in such a way as inevitably to control prices beyond Tennessee's borders. What Brown-Forman told the Tennessee Alcoholic Beverage Commission, indeed, was that the Brown-Forman decision made "the affirmation law[s] of all states" unconstitutional.
 
 
 39
 If the interaction of Tennessee's law with the laws of the other states should somehow create an extraterritoriality problem, moreover, the fault would not necessarily be Tennessee's, as opposed to being the fault of the other states. In other contexts, the Supreme Court has resolved such questions by resort to an "internal consistency" test reminiscent of Kant's categorical imperative; what would the effect be, the Court asks, if the statute under consideration were adopted in identical form by all states? See Container Corp. of America v. Franchise Tax Board, 463 U.S. 159, 169, 103 S.Ct. 2933, 2942, 77 L.Ed.2d 545 (1983). If the results of such universal adoption would be unacceptable, the statute may not pass constitutional muster.
 
 
 40
 Tennessee statute would pass the "internal consistency" test without difficulty. If every state adopted a liquor pricing statute identical to Tennessee's, market forces might, to be sure, be distorted enough to make Adam Smith turn in his grave. But "[t]he Constitution does not require the States to subscribe to any particular economic theory," CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 92, 107 S.Ct. 1637, 1651, 95 L.Ed.2d 67, 87 (1987), and with universal adoption of laws such as Tennessee's, no state would be forbidding any distiller to reduce its prices in any foreign state. Perhaps an out-of-state price cut would cost the distiller more than it would in a free market, but, under uniform affirmation laws identical to Tennessee's, no such price cut would be illegal.
 
 VIII
 
 41
 The plaintiffs in Beer Institute raised an "economic protectionism" issue that the Second Circuit found it unnecessary to reach in view of its holding that the Connecticut statute "inevitably exercise[d] control" over out-of-state prices and thus constituted a direct regulation of interstate commerce. 849 F.2d at 757-58. Brown-Forman contends here, as it contended in its challenge to the New York statute, that a law which disadvantages consumers in other states represents "the sort of 'simple economic protectionism' that [the Supreme Court] has routinely forbidden." Brown-Forman, 476 U.S. at 580, 106 S.Ct. at 2085, quoting Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). Where the Twenty-first Amendment is concerned, however, the short answer to this argument would seem to be that Seagram expressly rejected it: "As part of its regulatory scheme for the sale of liquor, [a state] may constitutionally insist that liquor prices to domestic wholesalers and retailers be as low as prices offered elsewhere in the country." Seagram, 384 U.S. at 43, 86 S.Ct. at 1260. (Emphasis supplied.) There has been no showing here that the Tennessee statute "disadvantages" out-of-state consumers any more than the statute upheld by the Supreme Court in Seagram did. As a Tennessee distiller, moreover (see note 6, infra ), Brown-Forman can hardly contend that the statute is unconstitutional because it treats local distillers more favorably than foreign distillers. Cf. Bacchus Imports, Limited v. Dias, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984).
 
 IX
 
 42
 We note, finally, that in the post-Brown-Forman case of CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987), the Supreme Court declared that "[t]he principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce." 481 U.S. at 87, 107 S.Ct. at 1648, 95 L.Ed.2d at 84. In this connection the Supreme Court referred with evident approval to Professor Regan's article at 84 Mich.L.Rev. 1091 (1986) on "The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause." Id.
 
 
 43
 Seagram teaches that statutes comparable to Tennessee's do not, on their face, "discriminate" against interstate commerce,[6] and Professor Regan--who has said that he is "inclined to think the Court was right" in Brown-Forman-- also thinks that the type of retrospective affirmation laws upheld in Seagram "do not violate the extraterritoriality principle." Regan, "Siamese Essays," 85 Mich.L.Rev. at 1903, 1905.
 
 
 44
 Neither, we presume, would Professor Regan consider such statutes impermissibly "protectionist." See 84 Mich.L.Rev. at 1244, where, in discussing Justice Marshall's opinion in Commonwealth Edison Co. v. Montana, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981), Regan suggests that the Montana statute at issue in Commonwealth Edison does not even have a protectionist effect, much less a protectionist purpose, because "[n]o local economic factor is favored, even in the effects of the statute, vis-a-vis any foreign competitor." Precisely the same thing can be said of Tennessee's affirmation statute--and if Professor Regan is a reliable guide, there is no reason why the author of Brown-Forman should have any difficulty in reconciling the opinion in that case with Justice Stewart's opinion in Seagram.
 
 
 45
 If what the Supreme Court is doing, in its dormant Commerce Clause cases, is "preventing state protectionism, where protectionism is defined in terms of purposeful favoring of locals over their foreign competitors," 84 Mich.L.Rev. at 1206 (emphasis omitted), then the Tennessee statute is not endangered, for it is no more a "protectionist" or "discriminatory" statute than it is an extraterritorial one. We need not decide, of course, whether Tennessee's affirmation law could properly serve as a model for legislation aimed at products not covered by the Twenty-first Amendment. Brown-Forman's products are subject to the Twenty-first Amendment, and reading Seagram and Brown-Forman together, we do not see why in-state sales of those products may not be regulated in the way Tennessee has chosen to regulate them.
 
 
 46
 We are not concerned with the wisdom of Tennessee's law, obviously, but only with its constitutionality. "[A] law can be both economic folly and constitutional." CTS Corp., 481 U.S. at 960-97, 107 S.Ct. at 1653, 95 L.Ed.2d at 90 (Scalia, J., concurring). A law duly enacted by a state legislature, with the assent of a state governor or over his veto, ought not to be set aside by an unelected federal judiciary unless the Constitution compels that drastic step.
 
 
 47
 We think the district court erred as a matter of law in its holding that the Tennessee statute is unconstitutional. The judgment of the district court is REVERSED, and the case is REMANDED with instructions to dissolve the injunction and dismiss the complaint.
 
 
 
 *
 The Honorable Barbara Hackett, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The district court did not use the phrase "dormant Commerce Clause," but might well have done. The court believed that the Tennessee statute affects interstate commerce in a way violative of what Mr. Justice Frankfurter called the "negative implications" of the constitutional grant to Congress of the power to regulate commerce among the several states. Extraterritorial legislation is often said to violate the Commerce Clause in its negative, or "dormant," aspect
 
 
 [2]
 A recent student law review note says that "[a]ll affirmation statutes begin by requiring producers to file monthly schedules listing the prices they will charge distributors in the state during the upcoming month." Note, "Liquor Price Affirmation Statutes and the Dormant Commerce Clause," 86 Mich.L.Rev. 186, 190 (1987). The Tennessee statute is an affirmation statute, but it imposes no such requirement. The Note argues that "all liquor price affirmation statutes violate the commerce clause." Id. at 188. The faulty premise may be immaterial as far as the affirmation laws of many states are concerned--see, e.g., In re The Beer Institute, 849 F.2d 753, 760 (2d Cir.1988), where the Note is cited in connection with a Connecticut statute that did require advance posting of price schedules--but the Note's argument is not to be accepted uncritically in the case of Tennessee
 
 
 [3]
 The Tennessee Attorney General has ruled that this is a "contemporaneous affirmation requirement" which "means that a supplier must affirm that its prices are no higher than its prices elsewhere at the very time of sale to a Tennessee wholesaler." Tennessee Attorney General Opinion 86-147, p. 5. (Emphasis supplied.)
 
 
 [4]
 "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."
 
 
 [5]
 In Brown-Forman Corp. v. South Carolina Alcoholic Beverage Control Commission, 643 F.Supp. 943 (D.S.C.1986), the South Carolina district court read the Supreme Court's Brown-Forman decision as requiring the invalidation of a South Carolina statute that bore little resemblance to New York's, but was essentially identical to Tennessee's. The district court seems to have interpreted Brown-Forman as teaching that where a price affirmation statute has the effect of making out-of-state price cuts costlier to the distiller, the statute is unconstitutional even though it does not make such price cuts illegal, as the New York statute did. We disagree with the district court's interpretation, which seems to deprive the Supreme Court's holding in Seagram of all meaning. The district court's decision was not appealed, so we do not know where the Court of Appeals for the Fourth Circuit would have come out on this question
 "[5] The Liquor Authority may 'for good cause shown' permit a distiller to change its prices during a particular month, ABC Law Sec. 101-b(3)(a), and New York speculates that the Authority would permit a distiller to lower its prices in other States in a given month so long as the distiller also lowers them in New York. However, whether to permit such a deviation from the statutory scheme is a matter left by the statute to the discretion of the Liquor Authority.
 We would not solve the constitutional problems inherent in New York's statute by indulging the dissent's assumption that the Authority will be sensitive to Commerce Clause concerns. Certainly New York could not require an out-of-state company to receive a license from New York to do business in other States, even if we were quite sure that such licenses would be granted as a matter of course. Similarly, New York simply may not force appellant to seek regulatory approval from New York before it can reduce its prices in another State. The protections afforded by the Commerce Clause cannot be made to depend on the good grace of a state agency."
 
 
 [6]
 See also Exxon Corp. v. Maryland, 437 U.S. at 125-26, 98 S.Ct. at 2213-14. Just as in-state gasoline dealers had no competitive advantage over out-of-state dealers under the Maryland statute that was upheld in Exxon, in-state distillers have no competitive advantage over out-of-state distillers under Tennessee's affirmation statute. And, as Brown-Forman's complaint in this case discloses, Brown-Forman happens to be an in-state distiller. Brown-Forman is a Tennessee corporation, and readers of the company's magazine advertising may recall that Brown-Forman's Jack Daniel distillery is located in Lynchburg, Tennessee